# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| YELLOW CORPORATION, *et al.*,[1] | ) | Case No. 23-11069 (CTG) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

**DEBTORS' MEMORANDUM OF LAW IN SUPPORT OF CONFIRMATION OF THE FOURTH AMENDED JOINT CHAPTER 11 PLAN OF YELLOW CORPORATION AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE PROPOSED BY THE DEBTORS AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS (TECHNICAL MODIFICATIONS)**

Laura Davis Jones (DE Bar No. 2436)
Timothy P. Cairns (DE Bar No. 4228)
Peter J. Keane (DE Bar No. 5503)
Edward Corma (DE Bar No. 6718)
**PACHULSKI STANG ZIEHL & JONES LLP**
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19801
Telephone:    (302) 652-4100
Facsimile:    (302) 652-4400
Email:    ljones@pszjlaw.com
tcairns@pszjlaw.com
pkeane@pszjlaw.com
ecorma@pszjlaw.com

Patrick J. Nash Jr., P.C. (admitted *pro hac vice*)
David Seligman, P.C. (admitted *pro hac vice*)
Robert A. Jacobson (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
333 W Wolf Point Plaza
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:    patrick.nash@kirkland.com
david.seligman@kirkland.com
rob.jacobson@kirkland.com

-and-

Allyson B. Smith (admitted *pro hac vice*)
Aaron Metviner (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:    allyson.smith@kirkland.com
aaron.metviner@kirkland.com

*Co-Counsel for the Debtors and Debtors in Possession*

---

[1]    A complete list of each of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/YellowCorporation.  The location of the Debtors' principal place of business and the Debtors' service address in these Chapter 11 Cases is: 11500 Outlook Street, Suite 400, Overland Park, Kansas 66211.

## <u>TABLE OF CONTENTS</u>

**Page(s)**

**Preliminary Statement**.................................................................................................1

**PROCEDURAL BACKGROUND AND VOTING RESULTS**...............................3

**I.**     **Procedural History**.......................................................................................3

**II.**     **The Plan Solicitation and Notification Process and Voting Results**...........9

**ARGUMENT**.......................................................................................................12

**I.**     **Response to Remaining Objections to Confirmation of the Plan.**................12

    **A.**     **The MFN/Mobile Street Objection Should Be Overruled.** ..............13

        **1.**     **The Plan Satisfies Section 1129(a)(7) of the Bankruptcy Code.** ..........13

        **2.**     **The Plan Satisfies Sections 1129(a)(3) and 1129(a)(5) of the Bankruptcy Code.** ....................................................16

    **B.**     **The Local 705 Objection Should Be Overruled.** ................................20

    **C.**     **The EPA Objection Should Be Overruled.**.......................................23

    **D.**     **The Sigmund Objection Should be Overruled.**................................29

    **E.**     **The Astra Objection Should Be Overruled.** ....................................30

**II.**     **The Plan Satisfies Each Requirement for Confirmation**............................30

    **A.**     **The Plan Complies with the Applicable Provisions of the Bankruptcy Code (§ 1129(a)(1)).**...............................................31

        **1.**     **The Plan Satisfies the Classification Requirements of Section 1122 of the Bankruptcy Code.** ........................31

        **2.**     **The Plan Satisfies the Mandatory Plan Requirements of Section 1123(a) of the Bankruptcy Code.** ..................35

    **B.**     **The Debtors Complied with the Applicable Provisions of the Bankruptcy Code (§ 1129(a)(2)).** .........................................39

        **1.**     **The Debtors Complied with Section 1125 of the Bankruptcy Code.**...............................................40

       2.       The Debtors Complied with Section 1126 of the Bankruptcy Code...................................................................................41

C.     The Plan Was Proposed in Good Faith (§ 1129(a)(3))....................................43

D.     The Plan Provides that the Debtors' Payment of Professional Fees and Expenses Are Subject to Court Approval (§ 1129(a)(4))...................................44

E.     The Debtors Have Complied with the Governance Disclosure Requirement (§ 1129(a)(5)). .................................................................................45

F.     The Plan Does Not Require Governmental Regulatory Approval (§ 1129(a)(6)).........................................................................................................46

G.     The Plan Is in the Best Interests of All the Debtors' Creditors (§ 1129(a)(7)).........................................................................................................46

H.     The Plan Is Confirmable Notwithstanding the Requirements of Section 1129(a)(8) of the Bankruptcy Code........................................................48

I.      The Plan Provides for Payment in Full of All Allowed Priority Claims (§ 1129(a)(9)).........................................................................................................49

J.      At Least One Class of Impaired, Non-Insider Claims Accepted the Plan (§ 1129(a)(10)).............................................................................................51

K.     The Plan Is Feasible (§ 1129(a)(11)). ...............................................................52

L.      The Plan Provides for the Payment of Certain Statutory Fees (§ 1129(a)(12)).......................................................................................................53

M.    Sections 1129(a)(13) through 1129(a)(16) of the Bankruptcy Code Do Not Apply to the Plan. .....................................................................................54

N.     The Plan Satisfies the "Cram Down" Requirements of Section 1129(b) of the Bankruptcy Code...................................................................................55

       1.       The Plan Does Not Unfairly Discriminate with Respect to the Impaired Classes That Have Not Voted to Accept the Plan (§ 1129(b)(1)). ...............................................................................55

       2.       The Plan Is Fair and Equitable (§ 1129(b)(2)). ..................................57

O.     The Plan Complies with the Remaining Provisions of Section 1129 of the Bankruptcy Code (Sections 1129(c)–(e)). ......................................................58

III.    The Discretionary Contents of the Plan Are Appropriate Under Section 1123(b) of the Bankruptcy Code. ........................................................................59

**A.      The Plan's Release, Exculpation, and Injunction Provisions Satisfy Section 1123(b) of the Bankruptcy Code.** ........................................................ 60

     **1.      The Debtor Release Is Appropriate.** ........................................................ 60

     **2.      The Consensual Third-Party Release Is Appropriate.** .......................... 66

     **3.      The Exculpation Provisions Are Appropriate.** ...................................... 70

     **4.      The Injunction Provision Is Appropriate.** ............................................. 73

**B.      The Plan Complies with Section 1123(d) of the Bankruptcy Code.** ................ 74

**C.      Modifications to the Plan.** ........................................................................ 75

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Bank of Am. Nat. Trust & Savs. Ass'n v. 203 N. LaSalle St. P'ship*,
    526 U.S. 434 (1999).................................................................................................46, 57

*Frito-Lay, Inc. v. LTV Steel Co. (In re Chateaugay Corp.)*,
    10 F.3d 944 (2d Cir. 1993)....................................................................................32

*Harrington v. Purdue Pharma L. P.*,
    603 U.S. 204 (2024)..............................................................................................68

*In re Abbotts Dairies of Pa., Inc.*,
    788 F.2d 143 (3d Cir. 1986)..................................................................................43

*In re Accuride Corp.*,
    No. 24-12289 (JKS) (Bankr. D. Del. Mar. 6, 2025) ...................................68, 70, 71

*In re AeroCision Parent, LLC*,
    No. 23-11032 (KBO) (Bankr. D. Del. Mar. 4, 2024) ............................................67

*In re Aleris Int'l, Inc.*,
    No. 09-10478, 2010 WL 3492664 (Bankr. D. Del. May 13, 2010) ....................33, 34, 39, 56

*In re Am. Solar King*,
    90 B.R. 808 (Bankr. W.D. Tex. 1988)...................................................................75

*In re Ambanc La Mesa L.P.*,
    115 F.3d 650 (9th Cir. 1997) ...........................................................................55, 56

*In re Armstrong World Indus., Inc.*,
    348 B.R. 111 (D. Del. 2006).............................................................................30, 56

*In re Armstrong World Indus., Inc.*,
    348 B.R. 136 (D. Del. 2006)..................................................................................34

*In re Aztec Co.*,
    107 B.R. 585 (Bankr. M.D. Tenn. 1989) ..............................................................56

*In re BlockFi Inc.*,
    No. 22-19361 (MBK) (Bankr. D.N.J. Oct. 3, 2023) .............................................34

*In re Boy Scouts of Am. & Del. BSA, LLC*,
    650 B.R. 87 (D. Del 2023)....................................................................................75

iv

*In re Boy Scouts of Am. & Delaware BSA, LLC,*
  642 B.R. 504 (Bankr. D. Del. 2022) ..................................................................18

*In re Boy Scouts of Am.,*
  137 F.4th 126 (3d Cir. 2025) ...........................................................................30

*In re Burns & Roe Enters., Inc.,*
  No. 08-4191, 2009 WL 438694 (D.N.J. Feb. 23, 2009) .....................................75

*In re Capmark Fin. Grp. Inc.,*
  No. 09-13684, 2011 WL 6013718 (Bankr. D. Del. Aug. 24, 2011) ...........33, 34, 52

*In re Celsius Network, LLC,*
  No. 22-10964 (MG) (Bankr. S.D.N.Y. Nov. 9, 2023) ........................................35

*In re Century Glove, Inc.,*
  1993 WL 239489 (D. Del. Feb. 10, 1993) .........................................................43

*In re Chapel Gate Apartments, Ltd.,*
  64 B.R. 569 (Bankr. N.D. Tex. 1986) ................................................................44

*In re Chesapeake Energy Corp.,*
  No. 20-33233 (DRJ) (Bankr. S.D. Tex. Jan. 16, 2021) ......................................35

*In re CJ Holding Co.,*
  No. 16-33590 (DRJ) (Bankr. S.D. Tex. Dec. 16, 2016) ......................................35

*In re Coram Healthcare Corp.,*
  315 B.R. 321 (Bankr. D. Del. 2004) .................................................31, 56, 61, 67

*In re Corona Plastics, Inc.,*
  99 B.R. 231 (Bankr. D.N.J. 1989) ...............................................................27, 28

*In re Daig Corp.,*
  17 B.R. 41 (Bankr. D. Minn. 1981) ..................................................................18

*In re Drexel Burnham Lambert Grp., Inc.,*
  960 F.2d 285 (2d Cir. 1992) .............................................................................73

*In re Emerge Energy Servs. LP,*
  No. 19-11563 (KBO), (Bankr. D. Del. Dec. 5, 2019) .........................................67

*In re Enron Corp.,*
  326 B.R. 497 (S.D.N.Y. 2005) .........................................................................73

*In re Exaeris, Inc.,*
  380 B.R. 741 (Bankr. D. Del. 2008) ..................................................................61

*In re Exide Techs.*,
    303 B.R. 48 (Bankr. D. Del. 2003) ........................................................................61

*In re EXP OldCo Winddown, Inc.*,
    No. 24-110831 (KBO) (Bankr. D. Del. Dec. 17, 2024)..........................................62, 68, 70, 71

*In re FAH Liquidating Corp.*,
    No. 13-13087 (KG) (Bankr. D. Del. July 28, 2014) ...............................................71

*In re Flintkote Co.*,
    486 B.R. 99 (Bankr. D. Del. 2012) ........................................................................52

*In re Freymiller Trucking, Inc.*,
    190 B.R. 913 (Bankr. W.D. Okla. 1996) ................................................................56

*In re Future Energy Corp.*,
    83 B.R. 470 (Bankr. S.D. Ohio 1988).....................................................................44

*In re General Motors Corp.*,
    407 B.R. 463 (S.D.N.Y. 2009)................................................................................26

*In re Glob. Safety Textiles Holdings LLC*,
    No. 09-12234, 2009 WL 6825278 (Bankr. D. Del. Nov. 30, 2009) ........................75

*In re Gulfport Energy Corp.*,
    No. 20-35562 (DRJ) (Bankr. S.D. Tex. Apr. 27, 2021).........................................35

*In re Indianapolis Downs. LLC*,
    486 B.R. 286 (Bankr. D. Del. 2013) ...................................................................63, 73

*In re Intelsat S.A.*,
    No. 20-32299 (KLP) (Bankr. E.D. Va. Dec. 17, 2021) .........................................35

*In re Invitae Corp.*
    No. 24-11362 (MBK) (Bankr. D.N.J. Aug. 2, 2024)...............................................34

*In re Jersey City Med. Ctr.*,
    817 F.2d 1055 (3d Cir. 1987)..................................................................................32

*In re JOANN Inc.*,
    No. 25-10068 (CTG) (Bankr. D. Del. July 10, 2025)....................................68, 70, 71

*In re Johns-Manville Corp.*,
    68 B.R. 618 (Bankr. S.D.N.Y. 1986) ......................................................................56

*In re Lab'y Partners, Inc.*,
    No. 13-12769 (PJW) (Bankr. D. Del. July 10, 2014) .............................................71

*In re Lapworth*,
No. 97-34529 1998 WL 767456 (DWS) (Bankr. E.D. Pa. Nov. 2, 1998) .............................39

*In re Lernout & Hauspie Speech Prods., N.V.*,
301 B.R. 651 (Bankr. D. Del. 2003) .......................................................................................56

*In re LINN Energy, LLC*,
No. 16-60040 (DRJ) (Bankr. S.D. Tex. Jan. 27, 2017) ..........................................................35

*In re Lisanti Foods, Inc.*,
329 B.R. 491 (D.N.J. 2005) ....................................................................................................44

*In re Lucky Bucks*,
No. 23-10758 (KBO) (Bankr. D. Del. July 28, 2023) ............................................................67

*In re Lyondell Chem. Co.*,
416 B.R. 108 (S.D.N.Y. 2009) ................................................................................................26

*In re Master Mortg. Inv. Fund, Inc.*,
168 B.R. 930 (Bankr. W.D. Mo. 1994) ...................................................................................61

*In re NII Holdings, Inc.*,
288 B.R. 356 (Bankr. D. Del. 2002) ........................................................................................43

*In re Nutritional Sourcing Corp.*,
398 B.R. 816 (Bankr. D. Del. 2008) ........................................................................................31

*In re Nuverra Env't Sols., Inc.*,
590 B.R. 75 (D. Del. 2018) ...........................................................................................31, 32, 56

*In re Oldco Tire Distribs., Inc.*,
No. 24-12391 (CTG) (Bankr. D. Del. Mar. 28, 2025)...........................................62, 68, 70, 71

*In re Penn. Va. Corp.*,
No. 16-32395 (KLP) (Bankr. E.D. Va. Aug. 16, 2016)..........................................................35

*In re Pizza of Hawaii, Inc.*,
761 F.2d 1374 (9th Cir. 1985) ................................................................................................52

*In re Premier Int'l Holdings, Inc.*,
No. 09-12019, 2010 WL 2745964 (Bankr. D. Del. Apr. 29, 2010).........................................71

*In re Prussia Assocs.*,
322 B.R. 572 (Bankr. E.D. Pa. 2005) ....................................................................................52

*In re PWS Holding Corp.*,
228 F.3d 224 (3d Cir. 2000)..........................................................................................43, 71, 73

*In re S&W Enter.*,
  37 B.R. 153 (Bankr. N.D. Ill. 1984) ..................................................31

*In re Smallhold, Inc.*,
  665 B.R. 704 (Bankr. D. Del. 2024) .................................................67

*In re Spansion, Inc.*,
  426 B.R. 114 (Bankr. D. Del. 2010) .................................................61

*In re Spansion*,
  No. 09-10690, 2010 WL 2905001 (Bankr. D. Del. 2010) ....................71

*In re Stone & Webster, Inc.*,
  286 B.R. 532 (Bankr. D. Del. 2002) .................................................46

*In re Sun Country Dev., Inc.*,
  764 F.2d 406 (5th Cir. 1985) ..........................................................43

*In re SunPower Corp.*,
  No. 24-11649 (CTG) (Bankr. D. Del. Oct. 18, 2024).........................62

*In re T-H New Orleans Ltd. P'ship*,
  116 F.3d 790 (5th Cir. 1997) ..........................................................43

*In re Tailored Brands, Inc.*,
  No. 20-33900 (MI) (Bankr. S.D. Tex. Nov. 13, 2020) ......................35

*In re TMP Directional Mktg., LLC*,
  No. 11-13835 (MFW) (Bankr. D. Del. Jan. 17, 2012)........................34

*In re Tonopah Solar Energy, LLC*,
  657 B.R. 393 (D. Del. 2022)............................................................52

*In re Tupperware Brands Corp.*,
  No. 24-12156 (BLS) (Bankr. D. Del. May 9, 2025)..................68, 70, 71

*In re Virgin Orbit*,
  No. 23-10405 (KBO) (Bankr. D. Del. July 31, 2023) ........................67

*In re Vyaire Med., Inc.*,
  No. 24-11217 (BLS) (Bankr. D. Del. Nov. 14, 2024) ........................62

*In re W. Coast Video Enters., Inc.*,
  174 B.R. 906 (Bankr. E.D. Pa. 1994) ...............................................67

*In re W.R. Grace & Co.*,
  475 B.R. 34 (D. Del. 2012)........................................................43, 52

*In re Wall Tube & Metal Products Co.*,
   831 F.2d 118 (6th Cir. 1987) ...........................................................................27

*In re Wash. Mut., Inc.*,
   442 B.R. 314 (Bankr. D. Del. 2011) ..........................................................61, 63

*In re WCI Cable, Inc.*,
   282 B.R. 457 (Bankr. D. Or. 2002)..................................................................61

*In re Wheel Pros, LLC*,
   No. 24-11939 (JTD) (Bankr. D. Del. Oct. 15, 2024) ............................................62

*In re World Health Alts., Inc.*,
   344 B.R. 291 (Bankr. D. Del. 2006) .................................................................61

*In re Zenith Elecs. Corp.*,
   241 B.R. 92 (Bankr. D. Del. 1999) ...........................................................61, 63

*John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*,
   987 F.2d 154 (3d Cir. 1993)........................................................................32, 55

*Kane v. Johns-Manville Corp.*,
   843 F.2d 636 (2d Cir. 1988)............................................................................52

*Matter of Borne Chemical Co.*,
   54 B.R. 126 (Bankr. D.N.J. 1984) ..............................................................27, 28

*Momentum Mfg. Corp. v. Emp. Creditors Comm. (In re Momentum Mfg. Corp.)*,
   25 F.3d 1132 (2d Cir. 1994).............................................................................40

*Ohio v. Kovacs*,
   469 U.S. 274 (1985)........................................................................................25

*U.S. v. Norton*,
   717 F.2d 767 (3d Cir. 1983)............................................................................30

**Statutes**

11 U.S.C. § 101(51D)(B) .....................................................................................58

11 U.S.C. §§ 101-1532 ..........................................................................................1

11 U.S.C. § 362(a)(7) ..........................................................................................30

11 U.S.C. § 363...................................................................................................23

11 U.S.C. § 365...................................................................................................24

11 U.S.C. § 507(a)(4) ..........................................................................................34

11 U.S.C. § 959................................................................................................28

11 U.S.C. § 959(b)........................................................................................27, 28

11 U.S.C. § 1102(a)............................................................................................18

11 U.S.C. § 1114................................................................................................54

11 U.S.C. § 1123(a)(1).......................................................................................35

11 U.S.C. § 1123(a)(4).......................................................................................36

11 U.S.C. § 1123(a)(5).......................................................................................37

11 U.S.C. § 1123(a)(6).......................................................................................38

11 U.S.C. § 1123(a)(7).......................................................................................38

11 U.S.C. § 1123(b)............................................................................................71

11 U.S.C. § 1123(b)(1).......................................................................................59

11 U.S.C. § 1123(b)(2).......................................................................................59

11 U.S.C. § 1123(b)(3).......................................................................................59

11 U.S.C. § 1123(b)(3)(A)..................................................................................61

11 U.S.C. § 1123(b)(4).......................................................................................59

11 U.S.C. § 1123(b)(5).......................................................................................59

11 U.S.C. § 1123(b)(6).......................................................................................59

11 U.S.C. § 1123(d)............................................................................................74

11 U.S.C. § 1125..........................................................................................39, 41

11 U.S.C. § 1125(b)............................................................................................40

11 U.S.C. § 1126..................................................................................10, 39, 41

11 U.S.C. § 1126(a)............................................................................................41

11 U.S.C. § 1126(f)............................................................................................41

11 U.S.C. § 1126(g)............................................................................................41

11 U.S.C. § 1129..........................................................................................12, 57

11 U.S.C. § 1129(a)(2)................................................................................................39

11 U.S.C. § 1129(a)(3)..................................................................................13, 16, 43

11 U.S.C. § 1129(a)(4)................................................................................................44

11 U.S.C. § 1129(a)(5)........................................................................................13, 16

11 U.S.C. § 1129(a)(5)(A)..........................................................................................45

11 U.S.C. § 1129(a)(11)..............................................................................................52

11 U.S.C. § 1129(e)....................................................................................................58

15 U.S.C. § 77e..........................................................................................................58

29 U.S.C. § 1405(b)......................................................................................21, 22, 23

Bankruptcy Code section 1129(a)(5)..........................................................................17

Bankruptcy Code section 1129(a)(7)................................................................. *passim*

Bankruptcy Code sections 1129(a)(10) and 1129(b)..................................................55

Bankruptcy Code section 1129(a)(12)........................................................................54

Bankruptcy Code Section 1129(a)(13)........................................................................54

Bankruptcy Code section 1129(b)..............................................................48, 49, 55, 57

Pension Benefit Guaranty Corporation under the American Rescue Plan Act of
    2021......................................................................................................................21

Title 28 § 1930............................................................................................................54

**Rules**

Local Rule 1015-1........................................................................................................3

**Other Authorities**

H.R. Rep. No. 95-595, *reprinted in* 1978 U.S.C. C.A.N. 5963 (1977).........................31

H.R. Rep. No. 595, 95th Cong., 1st Sess. (1977).......................................................39

S. Rep. No. 95-989, *reprinted in* 1978 U.S.C. C.A.N. 5787 (1978).............................31

S. Rep. No. 989, 95th Cong., 2d Sess. (1978)............................................................39

## RELIEF REQUESTED

The above-captioned debtors and debtors in possession (collectively, the "Debtors") submit this memorandum of law (this "Confirmation Brief") in support of confirmation of the *Fourth Amended Joint Chapter 11 Plan of Yellow Corporation and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code Proposed by the Debtors and the Official Committee of Unsecured Creditors (Technical Modifications)* [Docket No. 8144] (as modified, amended, or supplemented from time to time, the "Plan"),[2] pursuant to sections 1125, 1126, and 1129 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code").

In support of the Plan, the Debtors filed on November 5, 2025, the *Declaration of Stephenie Kjontvedt of Epiq Corporate Restructuring, LLC Regarding the Solicitation and Tabulation of Ballots Cast on the Fourth Amended Joint Chapter 11 Plan of Yellow Corporation and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code Proposed by the Debtors and the Official Committee of Unsecured Creditors* [Docket No. 8122] (the "Voting Report") and, concurrently herewith, the *Declaration of Brian Whittman, in Support of Confirmation of the Fourth Amended Joint Chapter 11 Plan of Yellow Corporation and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code Proposed by the Debtors and the Official Committee of Unsecured Creditors* (the "Whittman Declaration"). In further support of confirmation of the Plan, the Debtors respectfully state as follows:

## Preliminary Statement

1.      Following the unexpected shutdown of the Debtors' business and operations in July 2023, the Debtors commenced these chapter 11 cases to effectuate a value-maximizing

---

[2]      Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Plan or Disclosure Statement, as applicable.

monetization of their assets.  Such sale efforts were wildly successful, with the Debtors securing a $1.525 billion stalking horse bidder for substantially all of their real estate assets, which bid was subsequently topped, ultimately crystalizing into an initial wave of sale transactions generating approximately $1.8 billion in proceeds to the Estates.  The Debtors' continued sale successes enabled the repayment of *all* funded debt obligations, comprised of over $1.2 billion in prepetition funded debt and approximately $212.5 million in postpetition debtor-in-possession financing, within approximately six months of the Petition Date.

2.      The Debtors then turned focus to garnering consensus around an exit from these cases.  To say such negotiations were, and continue to be, hard-fought is an understatement. However, the Plan constitutes a balanced compromise of a range of complex and hotly contested issues in these chapter 11 cases.  Specifically, the Plan comprises a reasonable and fair waterfall structure, in addition to the Employee PTO/Commission Full Pay GUC Claims Class and the Convenience Class (each modestly sized with Claims thresholds of up to $7,500 per Claim), and provides for the establishment of an appropriately governed Liquidating Trust to manage remaining winddown processes and distributions to stakeholders.  Tellingly, the only voting Class, the General Unsecured Claims Class, voted overwhelmingly to accept the Plan at each Debtor.

3.      The Plan maximizes stakeholder recoveries as any currently actionable alternative is expected to materially reduce and delay distributions to Holders of Claims and, if applicable, Interests.  It is critical that the Plan be confirmed to permit the Debtors to finally bring these cases to a conclusion.

4.       The Debtors received ten formal objections and two informal objections to the Plan (collectively, the "Objections").[3]  Many of the Objections have been resolved consensually, either by agreement or with the inclusion of agreed-upon language in the Plan or in the Debtors' proposed confirmation order (the "Proposed Confirmation Order"), each as filed substantially contemporaneously herewith.  The Debtors continue to work to consensually resolve other outstanding Objections, but, to the extent such outstanding Objections are not resolved before the Confirmation Hearing, they should be overruled for the reasons stated herein and as the Debtors will establish at the Confirmation Hearing.

**PROCEDURAL BACKGROUND AND VOTING RESULTS**

**I.      Procedural History.**

5.       On August 6, 2023 (the "Petition Date") and continuing into August 7, 2023, each of the Debtors filed a voluntary petition with the Bankruptcy Court under chapter 11 of the Bankruptcy Code.  The Debtors are managing their business and their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  These Chapter 11 Cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Bankruptcy Rule 1015(b) and Local Rule 1015-1 [Docket No. 169].  No request for

---

[3]      A summary of the Objections to the Plan and the Debtors' responses thereto are attached as **Exhibit A** (the "Objection Resolution Chart").

the appointment of a trustee or examiner has been made in these Chapter 11 Cases.    On August 16, 2023, the U.S. Trustee appointed the Committee [Docket No. 269].[4]

6.    A detailed description of the Debtors and their businesses, and the facts and circumstances leading to the commencement of these Chapter 11 Cases, are set forth in greater detail in the *Declaration of Matthew A. Doheny, Chief Restructuring Officer of Yellow Corporation, in Support of the Debtors' Chapter 11 Petitions and First Day Motions* [Docket No. 14] (the "<u>First Day Declaration</u>").

7.    On September 2, 2024, the Debtors filed with the Bankruptcy Court the *Joint Chapter 11 Plan of Yellow Corporation and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 4253] and the *Disclosure Statement for the Joint Chapter 11 Plan of Yellow Corporation and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No 4254] (the "<u>First Disclosure Statement</u>"), along with the First Disclosure Statement Motion,[5] pursuant to which the Debtors sought a hearing on approval of the First Disclosure Statement and the related solicitation and voting procedures.

8.    On October 17, 2024, the Debtors filed with the Bankruptcy Court, the *First Amended Joint Chapter 11 Plan of Yellow Corporation and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 4580] and the *First Amended Disclosure Statement for the First Amended Joint Chapter 11 Plan of Yellow Corporation and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 4581].

---

[4]    The composition of the Committee was subsequently amended, *see* the *First Amended Notice of Appointment of Committee of Unsecured Creditors* [Docket No. 3430] and the *Second Amended Notice of Appointment of Committee of Unsecured Creditors* [Docket No. 5615].

[5]    *Motion of Debtors for Entry of an Order Approving (I) the Adequacy of the Disclosure Statement, (II) the Solicitation and Voting Procedures, (III) the Forms of Ballots and Notices in Connection Therewith, and (IV) Certain Dates with Respect Thereto* [Docket No. 4582] (the "First <u>Disclosure Statement Motion</u>").

9.        On November 20, 2024, the Debtors filed with the Bankruptcy Court, the *Second Amended Joint Chapter 11 Plan of Yellow Corporation and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 4974] (the "Second Amended Plan") and the *Second Amended Disclosure Statement for the Second Amended Joint Chapter 11 Plan of Yellow Corporation and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 4975].

10.       On November 22, 2024, the Bankruptcy Court entered the *Order Approving (I) the Adequacy of the Disclosure Statement, (II) the Solicitation and Voting Procedures (III) the Form of Ballot and Notices in Connection Therewith, and (IV) Certain Dates with Respect Thereto* [Docket No. 5024] authorizing the Debtors to solicit the Second Amended Plan.  Shortly thereafter, then-pending litigation among the Debtors and their largest creditors, coupled with an apparent lack of support for the Debtors' Second Amended Plan amongst the Debtors' largest creditors, incentivized hard-fought, good faith, arms' length settlement negotiations between the Debtors, the Committee and the Debtors' largest creditors and key stakeholders to drive consensus around the terms of a plan construct that would enable an orderly and value-maximizing resolution to these Chapter 11 Cases.

11.       After several months of focusing their efforts on the resolution of these outstanding disputes, the Debtors, the Committee, and certain of the Debtors' creditors holding the largest General Unsecured Claims negotiated the terms of a plan structure incorporating a settlement construct for certain significant Claims asserted against the Estates.   Accordingly, on March 28, 2025, the Debtors and the Committee filed the *Third Amended Joint Chapter 11 Plan of Yellow Corporation and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code Proposed by the Debtors and the Official Committee of Unsecured Creditors* [Docket No. 5995]

(the "Third Amended Plan") providing for a settlement of certain pending disputes between the Estates and certain multiemployer plan claimants (the "Plan Settlement"). The Third Amended Plan, and the Plan Settlement provided thereby, was intended to resolve significant litigation that would otherwise further delay confirmation of a chapter 11 plan and distributions to stakeholders and diminish funds available to pay Allowed Claims.

12.     However, as further described in Articles VII.J and VII.K of the Disclosure Statement [Docket No. 7619], events following the filing of the Third Amended Plan, including the Bankruptcy Court's Preliminary MEPP Opinion and the Filing of the Motion to Convert, forced the Debtors, the Committee, and other key stakeholders to reevaluate the Plan Settlement and reengage in further discussions to determine whether the proposed settlements embodied in the Third Amended Plan were still viable. The Plan Proponents determined they were not.

13.     Accordingly, on July 29, 2025, the Debtors filed with the Bankruptcy Court the *Fourth Amended Joint Chapter 11 Plan of Yellow Corporation and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code Proposed by the Debtors and the Official Committee of Unsecured Creditors* [Docket No. 6746] (the "Plan") and the *Fourth Amended Disclosure Statement for the Fourth Amended Joint Chapter 11 Plan of Yellow Corporation and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code Proposed by the Debtors and the Official Committee of Unsecured Creditors* [Docket No. 6747] (the "Disclosure Statement"), along with the Disclosure Statement Motion,[6] pursuant to which the Debtors sought a hearing on approval of the Disclosure Statement and the related Solicitation and Voting Procedures.

---

[6]     *Motion of the Debtors for Entry of an Order Approving (I) the Adequacy of the Disclosure Statement, (II) the Solicitation and Voting Procedures, (III) the Forms of Ballots and Notices in Connection Therewith, and (IV) Certain Dates with Respect Thereto* [Docket No. 6748] (the "Disclosure Statement Motion").

14.     On September 15, 2025, the Bankruptcy Court entered the *Order Approving (I) the Adequacy of the Disclosure Statement, (II) the Solicitation and Voting Procedures (III) the Form of Ballot and Notices in Connection Therewith, and (IV) Certain Dates with Respect Thereto* [Docket No. 7608] (the "Disclosure Statement Order"), approving, among other things, the procedures for solicitation and tabulation of votes on the Plan and related notices, forms, and ballots (collectively, the "Solicitation Packages").

15.     On September 16, 2025, the Debtors filed the solicitation version of the Plan [Docket No. 7619] and the Disclosure Statement [Docket No. 7619].

16.     On September 22, 2025, the Debtors filed with the Bankruptcy Court the *Notice of Hearing to Consider Confirmation of the Fourth Amended Joint Chapter 11 Plan and Related Voting and Objection Deadlines* [Docket No. 7667].

17.     On October 15, 2025, the Debtors filed with the Bankruptcy Court the *Plan Supplement for the Fourth Amended Joint Chapter 11 Plan of Yellow Corporation and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code Proposed by the Debtors and the Official Committee of Unsecured Creditors* [Docket No. 7787] (the "Initial Plan Supplement"), which includes the (a) Schedule of Assumed Executory Contracts and Unexpired Leases, (b) Schedule of Retained Causes of Action, including (i) Claims Related to Insurance Contracts and Policies and (ii) Claims, Defenses, Cross-Claims, and Counter-Claims Related to Litigation and Possible Litigation, (c) Identities of the Liquidating Trustee and the Liquidating Trust Board of Managers, and the (d) Liquidating Trust Agreement.

18.     On October 16, 2025, the Debtors filed with the Bankruptcy Court the *First Amended Plan Supplement for the Fourth Amended Joint Chapter 11 Plan of Yellow Corporation and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code Proposed by the Debtors*

*and the Official Committee of Unsecured Creditors* [Docket No. 7798] (the "First Amended Plan Supplement").

19.     On October 22, 2025, the Debtors filed with the Bankruptcy Court the *Second Amended Plan Supplement for the Fourth Amended Joint Chapter 11 Plan of Yellow Corporation and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code Proposed by the Debtors and the Official Committee of Unsecured Creditors* [Docket No. 7860] (the "Second Amended Plan Supplement").

20.     Contemporaneously herewith, the Debtors filed with the Bankruptcy Court the *Third Amended Plan Supplement for the Fourth Amended Joint Chapter 11 Plan of Yellow Corporation and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code Proposed by the Debtors and the Official Committee of Unsecured Creditors* (the "Third Amended Plan Supplement," and together with the Initial Plan Supplement, the First Amended Plan Supplement, and the Second Amended Plan Supplement, as amended, modified, or supplemented from time to time, the "Plan Supplement").  The Third Amended Plan Supplement includes the Liquidating Trust Agreement.[7]

21.     Contemporaneously herewith, the Debtors filed the *Fourth Amended Joint Chapter 11 Plan of Yellow Corporation and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code Proposed by the Debtors and the Official Committee of Unsecured Creditors (Technical Modifications)*, which sets forth technical and clarifying modifications and addresses certain Objections to the Solicited Plan.  The deadline  to file objections to the Plan was

---

[7]     *See* Third Amended Plan Supplement, Schedule D.

October 29, 2025, at 4:00 p.m. (prevailing Eastern Time).[8]  The deadline for all Holders of Claims entitled to vote on the Plan to cast their ballots was October 30, 2025, at 4:00 p.m. (prevailing Eastern Time).[9]

## II.    The Plan Solicitation and Notification Process and Voting Results.

22.    On or about September 26, 2025, the Debtors caused their claims and noticing agent, Epiq Corporate Restructuring, LLC (the "Claims and Noticing Agent"), to serve the Solicitation Packages on Holders of Claims entitled to vote on the Plan as of August 26, 2025 (the "Voting Record Date")—*i.e.*, Class 5 Holders of General Unsecured Claims (the "Voting Class")—in accordance with sections 1125 and 1126 of the Bankruptcy Code and the Solicitation Procedures.[10]

23.    On September 26, 2025, the Debtors caused the Confirmation Hearing Notice (as defined in the Disclosure Statement Order) to be served upon all known Holders of Claims or Interests (regardless of whether such parties are entitled to vote on the Plan),[11] and caused their Claims and Noticing Agent to publish the Confirmation Hearing Notice in the *New York Times* (national edition) and *The Globe and Mail* as provided in the Disclosure Statement Order.[12]

---

[8]    *See Notice of Extension of Deadline for Voting on the Fourth Amended Joint Chapter 11 Plan of Yellow Corporation and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code Proposed by the Debtors and the Official Committee of Unsecured Creditors* [Docket No. 7915].

[9]    *See Notice of Extension of Deadline for Voting on the Fourth Amended Joint Chapter 11 Plan of Yellow Corporation and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code Proposed by the Debtors and the Official Committee of Unsecured Creditors* [Docket No. 7915].

[10]    *See Certificate of Service of Solicitation Documents* [Docket No. 7775] (the "Solicitation Affidavit").

[11]    *See Id.*

[12]    *See Certificate of Publication Regarding Notice of Hearing to Consider Confirmation of the Fourth Amended Joint Chapter 11 Plan and Related Voting and Objection Deadlines (The New York Times)* [Docket No. 7706]; *Certificate of Publication Regarding Notice of Hearing to Consider Confirmation of the Fourth Amended Joint Chapter 11 Plan and Related Voting and Objection Deadlines (The Globe and Mail)* [Docket No. 7707]

24.     The Plan constitutes a separate Plan for each of the Debtors, and the classification of Claims and Interests set forth herein applies separately to each of the Debtors.  For purposes of administrative convenience, the Plan includes provisions applicable to all Debtors regarding the process by which distributions will be made under the Plan, but the Plan does not contemplate substantive consolidation.

25.     In compliance with the Bankruptcy Code and the Disclosure Statement Order, only Holders of Claims and Interests in Impaired Classes receiving or retaining property on account of such Claims or Interests were entitled to vote on the Plan.[13]  Holders of Claims and Interests were not entitled to vote if their rights are (a) Unimpaired under the Plan (in which case such Holders were conclusively presumed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code) or (b) Impaired and such Holders are not entitled to receive any distribution under the Plan (in which case such Holders were conclusively deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code).  For the avoidance of doubt, Holders of Interests in Class 8 (Interests in Yellow Corporation) were not entitled to vote and deemed to reject, but the Plan provides that, to the extent Distributable Proceeds is in an amount such that all unsecured Claims are paid in full, a distribution will be made to Holders of Interests in Class 8.  Accordingly, the following chart illustrates which Classes of Claims and Interests were entitled to vote on the Plan, and whether the Debtors solicited votes from Holders of such Claims and Interests:

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 1 | Secured Tax Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 2 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 3 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 4A | Employee PTO/Commission Full Pay GUC Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |

---

[13]     *See* 11 U.S.C. § 1126.

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 4B | Convenience Class Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 5 | General Unsecured Claims | Impaired | Entitled to Vote |
| 6 | Intercompany Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 7 | Intercompany Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 8 | Interests in Yellow Corporation | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 9 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

26.     The Debtors solicited votes on the Plan only from Holders of Claims in Class 5 (General Unsecured Claims).  The deadline to object to confirmation of the Plan was October 29, 2025, at 4:00 p.m. (prevailing Eastern Time) and the deadline for all Holders of Claims entitled to vote on the Plan to cast their Ballots[14] was October 30, 2025, at 4:00 p.m. (prevailing Eastern Time) (the "Voting Deadline").  As reflected in the Voting Report, of the 1,145 Ballots for Class 5 that were timely returned and counted, at least two-third of Class 5 Holders in amount and more than one-half of Class 5 Holders in number voted to accept the Plan on a per Debtor basis, satisfying the voting requirements of section 1126(c) of the Bankruptcy Code.[15]

27.     All Holders of Claims and Interests, regardless of whether they were entitled to vote on the Plan, had the opportunity to "opt in" to the Third-Party Release through their Ballots or Opt-In Forms, as applicable.  The Debtors received 317 affirmative opt-ins.

28.     As set forth above and in the Voting Declaration, the Voting Class voted overwhelmingly in favor of accepting the Plan.  The Plan will maximize the value of the Estates and maximize recoveries to Holders of Claims, as demonstrated by the Voting Classes' acceptance

---

[14]     The form of ballot used in solicitation was included as Exhibit 3, attached to the Disclosure Statement Order (the "Ballots").

[15]     See Voting Report, Exhibit A.

of the Plan.  Because the Plan meets the requirements of section 1129(b) as described below, the Bankruptcy Court should confirm the Plan over the Classes that were deemed to reject the Plan.

29.    The Confirmation Hearing is currently scheduled to take place on November 12, 2025, at 10:00 a.m. (prevailing Eastern Time).  Concurrently with the filing of this Confirmation Brief, the Debtors submitted the Proposed Confirmation Order.

## ARGUMENT

30.    This Confirmation Brief is organized as follows:  ***First***, the Debtors address and request that the Bankruptcy Court overrule the outstanding Objections.  ***Second***, the Debtors present their case-in-chief that the Plan satisfies the applicable requirements of section 1129 of the Bankruptcy Code by a preponderance of the evidence and should therefore be confirmed.

31.    For the reasons stated herein, and in light of the evidentiary support to be offered at the Confirmation Hearing and by the Declarations, the Debtors respectfully request that the Bankruptcy Court confirm the Plan.

## I.    Response to Remaining Objections to Confirmation of the Plan.

32.    Certain parties in interest objected to Confirmation of the Plan.[16]  As of the filing of this Confirmation Brief, the Debtors resolved many of the formal and informal Objections and continue to work diligently with all remaining objecting parties to resolve in advance of the Confirmation Hearing.  To the extent that Objections remain unresolved, they should be overruled and the Debtors reserve all rights to supplement their arguments in response to any Objection at the Confirmation Hearing.

---

[16]    *See* Objection Resolution Chart, Exhibit A.

**A.  The MFN/Mobile Street Objection Should Be Overruled.**

33.    MFN Partners, LP ("MFN") and Mobile Street Holdings, LLC ("Mobile Street" and, together with MFN, "MFN/Mobile Street") filed an objection (the "MFN/Mobile Street Objection")[17] asserting that the Plan cannot be confirmed for two reasons: *first*, MFN/Mobile Street argues the Plan does not satisfy the "best interests of creditors" test under section 1129(a)(7) of the Bankruptcy Code; and *second*, MFN/Mobile Street argues that the proposed governance and composition of the Liquidating Trust Board of Managers (the "Trust Board") violates Bankruptcy Code sections 1129(a)(3) and 1129(a)(5).

**1.    The Plan Satisfies Section 1129(a)(7) of the Bankruptcy Code.**

34.    MFN/Mobile Street alleges that the Plan fails to satisfy the "best interests of the creditors" test because the Disclosure Statement includes a qualitative analysis and contains "merely conclusory statements" comparing the creditors' outcome under the Plan to that of a hypothetical chapter 7 liquidation.[18]  Putting aside that this Court found the Disclosure Statement to contain adequate information,[19] and MFN/Mobile Street did not take issue with the inclusion of a qualitative Liquidation Analysis at the time the Disclosure Statement was approved, MFN/Mobile Street's assertions are wrong, and the MFN/Mobile Street Objection on this basis should be overruled.

35.    Since the MFN/Mobile Street Objection was filed, the Debtors produced to MFN/Mobile Street a quantitative liquidation analysis demonstrating that each Debtor provides to

---

[17]    *See Objection of MFN Partners, LP and Mobile Street Holdings, LLC to Confirmation of the Fourth Amended Joint Chapter 11 Plan of Yellow Corporation and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 7932] (filed under seal).

[18]    *See* MFN/Mobile Street Objection, ¶ 30.

[19]    *See* Disclosure Statement Order.

applicable creditors a recovery in chapter 7 that is less than what said creditors would receive under the Plan. Specifically, the analysis demonstrates that, in the initial instance, each Debtor provides to applicable creditors a recovery in chapter 7 that is less than what said creditors would otherwise receive under the Plan except for Roadway Express International, Inc., Yellow Logistics, Inc., and YRC Logistics Services Inc. (collectively, the "Affected Debtors").[20] However, practical considerations dictate an outcome whereby the Affected Debtors actually do *worse* under a chapter 7 than the Plan. Given that all Debtors but the Affected Debtors receive superior recoveries under the Plan, conversion of *all* 24 Debtor entities to chapter 7 would be illogical. Instead, such a scenario would prompt the Debtors to convert only the three Affected Debtor cases to chapter 7, with each Affected Debtor being properly burdened by the incremental costs of a chapter 7.[21] The Liquidation Analysis shows that if only the Affected Debtors, which are anticipated to hold a de minimis amount of Distributable Proceeds, are liquidated through chapter 7 separate from the other Debtor entities, which maintain larger portions of overall Distributable Proceeds that could help fund the administration of the chapter 7 liquidation in a complete conversion scenario, the Holders of Class 4A, Class 4B, and Class 5 Claims at the three Affected Debtors actually receive no recovery under the hypothetical chapter 7 because all available Distributable Proceeds would likely be wholly consumed by Administrative and Priority Claims and chapter 7 administration fees and expenses.[22]

---

[20]    *See* Whittman Declaration ¶ 44.

[21]    *Id.*

[22]    *Id.*

36.     Further, MFN/Mobile Street's argument implies that the inclusion of a convenience class inherently means a debtor can never satisfy the best interests test because the value diverted to a convenience class would otherwise be value available to junior classes in a straight chapter 7 liquidation without a convenience class.  What MFN/Mobile Street fails to acknowledge is that by providing a creditor with the option to opt into a convenience class, and thereby the option to opt into a superior recovery because payment in full up to the convenience class threshold is more than projected recovery on account of such Claim otherwise, treatment under the Plan is superior than treatment under a hypothetical chapter 7.[23]  Here, each Holder of a Class 5 Claim was given the option under the Plan to elect to have their Claim treated as a Convenience Class Claim.  Given the size of the non-joint & several Claims at the three Affected Debtors, the Plan provides that all such Holders of Class 5 Claims are able to receive more under the Plan than they would receive in a hypothetical chapter 7 liquidation, subject only to their individual decision as to whether to make such Convenience Claim Election.[24]  Because an individual creditor independently declined to exercise such option does not mean a debtor fails to satisfy Bankruptcy Code section 1129(a)(7). Furthermore, as explained above, the liquidation analysis shows that the incremental costs of chapter 7 subsume the limited value that is necessary to fund the Convenience Class at each Debtor in these cases.[25]

37.     Finally, MFN/Mobile Street wholly ignores the massive complexities of these chapter 11 cases and steep learning curve that would be required to onboard a chapter 7 trustee.

---

[23]     *Id.*

[24]     *Id.*

[25]     *Id.*

Tellingly, the only example MFN/Mobile Street provides is with respect to the remaining real estate sales process, which MFN/Mobile Street correctly notes is in its final stages. It is completely unrealistic to assume that a chapter 7 trustee could otherwise "easily pick up where the Debtors left off" at minimal cost with respect to significant pending litigation, including the very IBT Litigation to which MFN/Mobile Street ascribes great value but is in its infancy, in addition to other claims reconciliation matters. It is even more unrealistic to assume that any chapter 7 trustee would not also retain its own advisor groups—each presumably at a cost—who would necessarily undergo the same onboarding process.

38.     The Plan satisfies section 1129(a)(7) of the Bankruptcy Code and the MFN/Mobile Street Objection should be overruled on this basis.

**2.      The Plan Satisfies Sections 1129(a)(3) and 1129(a)(5) of the Bankruptcy Code.**

39.     Unsurprisingly, MFN/Mobile Street again puts forth baseless arguments and accusations that the proposed composition and governance of the Trust Board is a conspiratorial "gotcha" to completely eschew fiduciary duties and obligations in favor of self-serving or self-enriching actions. MFN/Mobile Street relies on these unfounded notions to argue the Plan does not satisfy 1129(a)(3) of the Bankruptcy Code. Despite making these claims for the better part of one year, MFN/Mobile Street has failed to ever provide any evidence to support its claims, and the reason is simple: no such evidence exists.

40.     MFN/Mobile Street goes on to state the Plan cannot be confirmed because the proposed Trust Board does not represent, specifically, the interests of equity security holders.[26] Based on the information and circumstances available to the Plan Proponents as of the date of this

---

[26]     *See* MFN/Mobile Street Objection, ¶ 49.

Confirmation Brief, general unsecured creditors are the fulcrum stakeholders.  Nonetheless, the Plan provides a means for a distribution to equityholders should Distributable Proceeds be such that all Allowed General Unsecured Claims are paid in full.[27]  The Plan does **not** cancel or extinguish equity on the Effective Date but instead provides Holders of Interests in Yellow Corporation beneficial interests in the Liquidating Trust and a mechanism whereby if Allowed General Unsecured Claims are paid in full, the Trust Board will be reconstituted with equityholder-appointed managers.[28]  But, until that occurs, it is entirely appropriate that the Trust Board be comprised of managers that are *currently* the beneficiaries of the Liquidating Trust, *i.e.*, Holders of General Unsecured Claims.

41.    MFN/Mobile Street also argues that the Plan fails to satisfy the requirement, laid out in section 1129(a)(5) of the Bankruptcy Code, that a plan proponent disclose the identity and affiliations of any individual proposed to serve as a director, officer or voting trustee of the Debtor post-Confirmation and that the appointment of such individual be "consistent with the interests of creditors and equity security holders and with public policy."[29]  The Debtors did disclose the identity of the Liquidating Trustee[30] and struggle to understand how an independent third-party fails to meet this standard.  Moreover, MFN/Mobile Street's attempt to improperly stretch this requirement to the broader Trust Board is already addressed by the extensive governance protocols proposed under the Liquidation Trust Agreement.  MFN/Mobile Street proffers—without offering

---

[27]    *See* Plan, Art. I.A.61, Art. III.B.9.

[28]    *See* Plan, Art. I.A.95.

[29]    11 U.S.C. § 1129(a)(5).

[30]    First Amended Plan Supplement, Exhibit C.

any caselaw on point with the facts at issue here—that the Plan should fail because, by failing to meet standards that by law do not apply to the broader Trust Board, it does not "exhibit[] a fundamental fairness in dealing with the creditors."[31]  Nonetheless, the Debtors will briefly address certain of the statements made in the MFN/Mobile Street Objection.

42.    MFN/Mobile Street previously objected to adequacy of the Disclosure Statement by speculating that the Trust Board would be controlled by conflicted parties.[32] Now, after the Plan Proponents disclosed the identities of the Liquidating Trustee and the managers of the Trust Board,[33] and proven MFN/Mobile Street's speculation to be incorrect, MFN/Mobile Street argues that the Trust Board is yet still conflicted, despite the inclusion of RFT Logistics LLC ("RFT"), a smaller trade creditor whose interests are inherently *adverse* to those of Holders of Multiemployer Plan Claims, and an independent third-party to serve as manager and Liquidating Trustee. Specifically, MFN/Mobile Street argues the Trust Board is conflicted because three of the five managers are currently Committee members, and a majority former-Committee member board does not adequately represent all creditors.  The gymnastics performed by MFN/Mobile Street to reach the conclusion that members of the Committee—a Court-appointed estate fiduciary whose sole purpose is to represent the interests of all unsecured creditors[34]—do not adequately represent all creditors are impressive.

---

[31]    *See* MFN/Mobile Street Objection, ¶ 45-47; *see also In re Boy Scouts of Am. & Delaware BSA, LLC*, 642 B.R. 504, 645 (Bankr. D. Del. 2022).

[32]    *See Objection of MFN Partners, LP and Mobile Street Holdings, LLC to (A) Approval of Fourth Amended Disclosure Statement for the Fourth Amended Chapter 11 Plan of Yellow Corporation and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code and (B) Solicitation of Procedures Motion* [Docket No. 7509], ¶ 6.

[33]    First Amended Plan Supplement, Exhibit C.

[34]    11 U.S.C. 1102(a); *see In re Daig Corp.*, 17 B.R. 41, 43 (Bankr. D. Minn. 1981) ("[It is] a fundamental concept underlying underlying the Code and those minimum statutory requirements found in Section 1102 [that t]he

43.     MFN/Mobile Street further argues that there is no reason that Committee members are "any better suited to assume [the role of a Liquidating Trust Manger] than any other similarly situated creditor,"[35] discounting the experience and familiarity that soon-to-be-former members of the Committee have with the Debtors' outstanding Claims and Causes of Action and the benefit and costs savings that this experience will bring to the Liquidating Trust.

44.     Finally, MFN/Mobile Street attempts to distinguish these cases from the dozens of other chapter 11 cases that provide for establishment of a liquidating trust and ordinary course trust governance protocols.  While these cases have certainly been unique for a number of reasons, no facts exist here that require a different outcome.[36]  Nonetheless, in efforts to reach resolution, the Plan Proponents engaged extensively with counsel to MFN/Mobile Street regarding the terms of the Liquidating Trust Agreement.  This may not have been apparent to the Bankruptcy Court because MFN/Mobile Street attached a redline reflecting only the few comments the Plan Proponents declined to accept, but as evidenced by the revised Liquidating Trust Agreement and redline included in the Third Amended Plan Supplement filed contemporaneously herewith, MFN/Mobile Street's comments were overwhelmingly accepted or otherwise addressed.

---

creditors' committee is not merely a conduit through whom the debtor speaks to and negotiates with creditors generally. ***On the contrary, it is purposely intended to represent the necessarily different interests and concerns of the creditors it represents.*** It must necessarily be adversarial in a sense, though its relation with the debtor may be supportive and friendly.") (emphasis added).

[35]     *See* MFN/Mobile Street Objection, ¶ 50.

[36]     *See also* Sept. 4, 2025 Tr. at 11:4-22 (Judge Goldblatt, summarizing the purpose of the Liquidating Trust Agreement and discussing whether it "differs in any meaningful way from what is standard and customary," noted that the Liquidation Trust Agreement "provides for the creation of a post-confirmation trust that will take the assets of the estate and basically take over the responsibility that the debtor-in-possession had to serve as Trustee and manage the estate assets and deal, in the first instance, with the liquidation of otherwise unliquidated claims . . . [a]nd it's a trust in the first instance for the benefit of creditors and, therefore, the beneficiaries of the trust have governance control over the trust," and concluded that he *"see[s] that, like, in every case"* and does not *"understand [] what's special and nefarious about what's happened here that distinguishes it from what [he] sees every day"*) (emphasis added).

45.     MFN/Mobile Street gambled on the value and potential recovery to equityholders of the Debtors, acquiring approximately 42.5% of the Debtors' equity in the weeks leading up to the Petition Date, and now have buyer's remorse.  MFN/Mobile Street argues both that the Trust Board is improperly equipped to settle any Multiemployer Plan Claims due to alleged conflicted interests, but also states that any settlement achieved by the Debtors now, prior to the Effective Date and establishment of the Liquidating Trust, Liquidating Trustee, and Trust Board, would violate the best interests test unless such settlement was the product of working closely with, and presumably supported by, MFN/Mobile Street.[37]  Not surprisingly, MFN/Mobile Street provided zero case law to support this position.

46.     While the Debtors too would celebrate an outcome that provided for a guaranteed recovery to equity, those are not the facts these cases currently face.  And MFN/Mobile Street's continued objections, grounded in wholly unjustified accusations and presented without evidence, are thinly-veiled attempts to give themselves the very veto power about which they state concern and should be overruled.

**B.      The Local 705 Objection Should Be Overruled.**

47.     Local 705 International Brotherhood of Teamsters Pension Fund ("Local 705") filed an objection (the "Local 705 Objection") arguing that the Plan improperly reserves Claims and Causes of Action, including objections to Claims held by Local 705, because such rights either have been resolved or discharged by the Estate during these Chapter 11 Cases.  Specifically, Local 705 argues that the Debtors are barred under principles of *res judicata* from raising arguments regarding the subordination of Local 705's Claims because the Debtors had the opportunity to do so while litigating the Debtors' Seventh Omnibus Claims Objection.

---

[37]     *See* MFN/Mobile Street Objection, ¶ 4.

48.     The Local 705 Objection is meritless.  It makes the same arguments previously advanced by Local 705 and considered and rejected by the Bankruptcy Court in holding that Debtors did not waive the argument that 29 U.S.C. § 1405(b) applies to subordinate a portion of Local 705's Multiemployer Plan Claims.[38]  The Debtors asserted the section 1405(b) argument in their Seventh Omnibus Claims Objection,[39] which argument applies to *all* Non-SFA Pension Plans[40] subject to the Seventh Omnibus Claims Objection, including Local 705.[41]  Then, in their summary judgment briefing, the Debtors raised the section 1405(b) argument against *all* relevant pension plans, including Local 705.[42]  Local 705 and other pension plans argued in response that the Debtors had waived their section 1405(b) argument.[43]  In particular, Local 705 made the same waiver arguments they now make, namely, that the Debtors did not include subordination in objection to Local 705's Claims or in response to discovery requests.[44]  Local 705 also participated

---

[38]     *Memorandum Opinion Setting Forth Preliminary Observations on Remaining Multiemployer Pension Plan Claims Allowance Disputes* [Docket No. 6030], ¶ 49-50.

[39]     *See Debtors' Seventh Omnibus (Substantive) Objection to Proofs of Claim for Withdrawal Liability* [Docket No. 2595] (the "Seventh Omnibus Claims Objection").

[40]     "Non-SFA Pension Plans" refers to those multiemployer pension plans that did not apply for or did not receive Special Financial Assistance (SFA) from the Pension Benefit Guaranty Corporation under the American Rescue Plan Act of 2021.

[41]     *See* Seventh Omnibus Claims Objection, ¶ 13, n.24 ("Finally, some portion of the Pension Plans' Proofs of Claim must also be subordinated under 29 U.S.C. § 1405(b) . . ."); *see also id.* ¶ 1 ("Pension Plan" is defined to include Local 705).

[42]     *See e.g.*, *Debtors' Motion for Partial Summary Judgment on SFA MEPPs' and Non-SFA MEPPs' Claims* [Docket No. 5217], ¶ 40.

[43]     *Local 705 Pension Fund's Reply to Debtors' Opposition to the SFA MEPPs' and Non-SFA MEPPs' Motions for Partial Summary Judgment* [Docket No. 5458], ¶ 6, n.4; *The Funds' Response in Opposition to Debtors' Motion for Partial Summary Judgment* [Docket No. 5378], ¶¶ 10-11; *Seven SFA Multiemployer Pension Plans' Opposition to Debtors' Motion for Partial Summary Judgment on SFA MEPPs' and Non-SFA MEPPs' Claims* [Docket No. 5377], ¶ 16.

[44]     *Local 705 Pension Fund's Reply to Debtors' Opposition to the SFA MEPPs' and Non-SFA MEPPs' Motions for Partial Summary Judgment* [Docket No. 5458], ¶ 6, n.4.

in the January 28, 2025 oral argument and had the opportunity to raise these waiver arguments (it did not).[45] Notwithstanding the pension plan's arguments, the Court held that Debtors' section 1405(b) argument is properly preserved, that "addressing this issue on the merits will not unfairly prejudice the objecting plans" because "all parties have now had a reasonable opportunity to present their arguments on the issue," and the Court noted there was an "absence of any identifiable prejudice."[46] Local 705 did not move to reconsider or appeal the Court's ruling and cannot do so in a plan objection.

49.     In any event, there is no identifiable prejudice to Local 705 (either addressed in the Bankruptcy Court's ruling or otherwise) and the discovery responses that Local 705 cites are not to the contrary.  According to Local 705, the Debtors stated in discovery that they only object that Local 705 should have discounted its Claim to present value.[47] But the Debtors' statement was made in response to Local 705's Interrogatory No. 4, which asked the Debtors to state the bases for the Debtors' contention that Local 705 "relied upon inflated contribution rates, failed to account for required liability caps, and/or neglected to discount their claims to present value."[48] The Debtors' response that they "only object that Local 705 should have discounted its claim to present value" was thus, as Local 705 acknowledges in its plan objection,[49] merely made in the context of stating which objections, among the three articulated in Interrogatory No. 6, the Debtors were still

---

[45]     Jan 28, 2025 Tr. at 104-111.

[46]     *Memorandum Opinion Setting Forth Preliminary Observations on Remaining Multiemployer Pension Plan Claims Allowance Disputes* [Docket No. 6030], ¶ 49-50.

[47]     Local 705 Objection, ¶ 2.

[48]     Local 705 Objection, Exhibit A, ¶ 18-19, Exhibit B, ¶ 3.

[49]     *See* Local 705 Objection, ¶ 17.

pursuing.[50]   Nor is the Debtors' general statement—that the Debtors did not contend Local 705's proofs of claims to not be entitled to be treated as Allowed General Unsecured Claims with the right to receive distributions at the same priority as all other Allowed General Unsecured Claims— inconsistent with the Debtors' argument that a portion of Local 705's Claims may be subordinated to other unsecured claims in the event the Debtors are insolvent under section 1405(b).   Regardless, as noted above, Local 705 had more than ample opportunity to raise these waiver arguments during summary judgment briefing and the Court already declined to rule in Local 705's favor.   Accordingly, the Local 705 Objection should be overruled.

### C.    The EPA Objection Should Be Overruled.

50.    The United States, on behalf of the Environmental Protection Agency (the "EPA"), filed an objection (the "EPA Objection")[51] following negotiations between the Plan Proponents and EPA in an effort to consensually resolve EPA's concerns.   While the Debtors appreciate the EPA's willingness to collaborate, and such efforts remain ongoing, to date, the parties have not reached resolution.

51.    The EPA Objection argues that the Plan is deficient because it lacks adequate language to ensure the Debtors' continued compliance with applicable environmental obligations under non-bankruptcy law in connection with the potential investigation and remediation of potential releases of hazardous material from underground and aboveground storage tanks (the "Storage Tanks") located at the Debtors' formerly owned and formerly leased properties, which properties were sold pursuant to section 363 of the Bankruptcy Code or rejected pursuant

---

[50]    Local 705 Objection, Exhibit B, ¶ 3.

[51]    *See United States' Limited Objection and Reservation of Rights to the Fourth Amended Joint Chapter 11 Plan of Yellow Corporation and Its Debtor Affiliates Pursuant to the Chapter 11 of the Bankruptcy Code Proposed by the Debtors and the Official Committee of Unsecured Creditors* [Docket No. 8084].

to section 365 of the Bankruptcy Code, as applicable, during the course of these Chapter 11 Cases.[52]

52.    Specifically, the EPA argues that, notwithstanding that the Debtors no longer own, operate, or even have the practical ability to access many of the sites at issue (and for many, have not had such access for nearly two years), if the new or pre-existing property owner has failed to correct the applicable registration—a task that can only be completed by the property owner and is wholly out of the control of the Debtors—the Debtors, and soon the Liquidating Trustee, remain responsible for any environmental liability associated with the Storage Tanks on such property, including the administrative burden of chasing the property owners to correct registrations or otherwise recoup costs of defending against any asserted liability on account of sites no longer under the Debtors' control.

53.    The EPA largely ignores that the facts of these Chapter 11 Cases and the Plan provide for the orderly wind-down of the Debtors and their Estates and their dissolution as of the Effective Date, followed by the appointment of a Liquidating Trustee to wind down the Debtors' remaining affairs, including by facilitating the payment of distributions under the Plan and resolving the Debtors' preexisting disputes and litigation matters.  As discussed at length in the Disclosure Statement,[53] the vast majority of the Debtors' owned and leased real property assets were disposed of pursuant to the Debtors' sale process, and the Liquidating Trustee stands poised to pick up where the Debtors are leaving off.  Accordingly, upon the Effective Date, the Liquidating Trustee will retain only the Liquidating Trust Assets—which will consist largely of

---

[52]    *See* EPA Objection, ¶ 1.

[53]    *See* Disclosure Statement, Art. VII.G.

Retained Causes of Action, Assigned Insurance Rights, Distributable Proceeds, and limited real property currently owned by the Debtors—and all remaining non-residential real property Unexpired Leases will be rejected.[54]

54.    In advancing its argument, the EPA cites to caselaw that is supportive of the Debtors' position.    The EPA cites to *Ohio v. Kovacs*, the seminal case on the treatment of environmental claims in bankruptcy, for the contention that the Debtors must comply with the asserted environmental obligations.[55]    However, in *Kovacs*, the Supreme Court held that a State of Ohio cleanup order was dischargeable where the State of Ohio had appointed a receiver to take over the debtor's property and conduct an environmental cleanup, which the Court determined had effectively converted the injunctive order into a cost reimbursement claim consequently dischargeable in bankruptcy.[56]    Like here, the debtor in *Kovacs* no longer had access to the property, with the Supreme Court noting that the *Kovacs* debtor was "disabled by the receivership from personally taking charge of and carrying out the removal of wastes from the property."[57] Notably, the statutory authority under which the State of Ohio obtained the injunction contained no express right to seek reimbursement; therefore, *Kovacs* stands for the proposition that, even in the absence of an express monetary remedy,[58] equitable obligations may be converted into dischargeable claims if a debtor has been effectively "disabled" from compliance.

---

[54]    *See* Plan, Art. I.A.94, Art. V.A.

[55]    *See* EPA Objection, ¶ 1.

[56]    *See Ohio v. Kovacs*, 469 U.S. 274 (1985), generally.

[57]    *Id.*, at 283.

[58]    *See Id*, at 281, n.9.

55.     Furthermore, to the extent that the Debtors have sold a real property asset, the purchaser, as the EPA concedes in its Objection, assumes such liabilities and "would have to comply with its environmental responsibilities starting with the day it got the property" including "if the property required remediation as of that time, [as] any such remediation would be the buyer's responsibility."[59]    Such environmental responsibilities include correcting the applicable registration of the Storage Tanks.

56.     With respect to rejected properties, the EPA contends that rejection has no effect on the Debtors' environmental obligations, citing to one case not binding in this district, *In re Lyondell Chem. Co.,* for the contention that the rejection of a lease does not authorize debtors to abandon environmentally hazardous property at the leased facility.[60]    *Lyondell* is factually distinguishable from the instant case in that the rejection order for the applicable property had been entered mere months prior to the movants' attempt to enforce the same while the relevant debtor was still operating in chapter 11.[61]    Here, as the Debtors have repeatedly emphasized, these Chapter 11 Cases were filed following the cessation of the Debtors' business, with the express and sole purpose of effectuating a full scale winddown of the Debtors' assets, including by vacating and seeking the rejection of certain unexpired real property leases as early as three weeks into these Chapter 11 Cases[62] and continuing to do so over the last 26 months.  Given that certain

---

[59]     *In re General Motors Corp.*, 407 B.R. 463, 508 (S.D.N.Y. 2009); *see also*, EPA Objection, ¶ 18.

[60]     *In re Lyondell Chem. Co.*, 416 B.R. 108, 117 (S.D.N.Y. 2009); *see also*, EPA Objection, ¶ 20.

[61]     *Lyondell*, at 109 (the court, in a September 2009 decision noting, that the movant "moves for an order enforcing and clarifying [an] order dated March 13 of this year [], which had authorized rejection of a ground lease.")

[62]     *See Omnibus Motion of Debtors Seeking Entry of an Order (I) Authorizing (A) Rejection of Certain Executory Contracts and Unexpired Leases Effective as of Dates Specified Herein and (B) Abandonment of Certain Personal Property, If Any, and (II) Granting Related Relief* [Docket No. 394].

properties were vacated and rejected more than two years ago and the Debtors are on the precipice of dissolution, the Debtors lack the practical ability to access rejected properties that they either have not had access to for some time or, in the case of the Liquidating Trustee, have never had access to nor been in any sort of legal or contractual privity with the owner thereof.

57.    Finally, citing to only one case not binding in this district, *In re Wall Tube & Metal Products Co.*, the EPA contends that a liquidating trustee must comply with state law, including environmental state law, just as a trustee or debtor-in-possession must do under section 959(b) of the Bankruptcy Code.[63]  Not only is *Wall Tube* factually distinguishable in that it dealt with a chapter 7 trustee managing and liquidating assets actively owned and operated by an existing corporate chapter 7 debtor rather than a post-effective date liquidating trust remaining after the debtors' dissolution,[64] but case law from this circuit has held to the contrary.  In *Matter of Borne Chemical Co.*, the United States Bankruptcy Court for the District of New Jersey held that "[section] 959(b) [of the Bankruptcy Code] is applicable only where the property is being managed or operated for the purpose of continuing operations."[65]  There, the court ordered that the debtor, a corporation in the process of liquidating all of its assets in order to fund a plan, was authorized to cease operations at a certain property and abandon such property, free of the obligations imposed under a certain state environmental regulation.[66]  In *In re Corona Plastics, Inc.*, the United States

---

[63]    831 F.2d 118, 122 (6th Cir. 1987).  Section 959(b) of the Bankruptcy Code requires, in pertinent part, that trustees and debtors-in-possession "manage and operate the property in [their] possession . . . according to the requirements of the valid laws of the State in which such property is situated, in the same manner that the owner or possessor thereof would be bound to do if in possession thereof."

[64]    *Wall Tube*, 831 F.2d at 120-21.

[65]    54 B.R. 126, 135 (Bankr. D.N.J. 1984).

[66]    *Id.*

Bankruptcy Court for the District of New Jersey, in holding that a liquidating chapter 11 trustee was not responsible for compliance with a certain state environmental statute related to environmental damage at a manufacturing plant formerly leased and operated by the Debtors, found that section 959(b) is not applicable where the trustee is "not conducting business, but instead is disposing of the assets of the estate."[67]  There, the court also noted that the history of section 959 of the Bankruptcy Code shows that the "purpose of the statute is to negate the idea that a trustee or debtor in possession could ignore the rules of law of the state of operation affecting the *conduct of business* committed to his charge."[68]

58.    Here, the Debtors' business ceased to exist approximately 30 months ago, prior to the filing of these Chapter 11 Cases, the Debtors have disposed of the vast majority of their assets through a continuing sale process, and the Liquidating Trustee, like those addressed by the court in *Borne Chemical* and *Corona Plastics*, will serve only to wind-down and manage the Debtors' limited existing assets, which consist largely of the proceeds of the aforementioned asset sales and retained causes of action.  As for remaining real property assets, the owned real property assets noted by the EPA have either been sold, with those sales subject to final order of this Court, as of the filing of this Confirmation Brief, or are expected to be sold prior to the Effective Date; the formerly leased properties have been rejected and their control has been turned over to their owners such that requiring the Liquidating Trustee to fulfill environmental obligations thereon would be impracticable and, as prior discussed, inconsistent with the relevant caselaw.  The EPA Objection should be overruled.

---

[67]    99 B.R. 231, 236 (Bankr. D.N.J. 1989).

[68]    *Id.* (emphasis added).

**D.**     **The Sigmund Objection Should be Overruled.**

59.     Mr. Sigmund is a retired employee and small shareholder of the Debtor.  In his objection (the "Sigmund Objection"),[69] Mr. Sigmund appears to take issue with the proposed releases arguing that the Plan improperly grants broad releases or immunities to certain of the Debtors' former executives.[70]

60.     While current and former directors, managers, officers of the Debtors and other Related Parties will receive the benefit of the Third-Party Release, they are receiving the benefit of the Third Party Release in exchange for the important role that they played in facilitating the formulation and negotiation of the Plan.  Furthermore, as discussed in further detail in Section II.A.2 of this Confirmation Brief, the Third-Party Release is fully consensual and is not binding on any non-consenting parties.  The Debtors have no record of Mr. Sigmund having filed a Claim in these Chapter 11 Cases, nor was he scheduled to receive one.  Accordingly, Mr. Sigmund did not submit a Ballot nor did Mr. Sigmund remit an Opt-In form binding him to the Third-Party Release.  Thus, the Sigmund Objection should be overruled.

61.     In any event, the Debtors engaged with Mr. Sigmund in an attempt to resolve his concerns.  The Debtors also advised Mr. Sigmund of the date and time of the Confirmation Hearing.  In response, Mr. Sigmund informed the Debtors that he was unwilling to engage on the terms of any resolution.  However, for the reasons stated above, the Sigmund Objection should be overruled.

---

[69]     *See Objection of Gregg A. Sigmund, Shareholder and Retired Employee, to Confirmation of Plan* [Docket No. 7830].

[70]     *See* Sigmund Objection, pgs. 1-2.

### E.    The Astra Objection Should Be Overruled.

62.    Astra Supply Chain ("Astra Inc") ("Astra"), a former customer provided papers to the Debtors (the "Astra Objection") demanding that Astra be released from any and all debts owed to the Debtors because the Debtors purportedly owe certain amounts to Astra in connection with prepetition cargo claims.  At a certain point in these Chapter 11 Cases, the Debtors and Astra had been engaged in discussions on the potential settlement of their asserted claims with each other, but ultimately were unable to reach a settlement.  Upon receiving the Astra Objection, the Debtors reengaged with Astra.  Shortly thereafter, Astra filed on October 22, 2025 and October 24, 2025, two late proofs of claim on account of these cargo claims.[71]  To the extent that Astra intended the Astra Objection as an objection to Confirmation, it should be overruled because it fails to provide any basis that the Plan is unconfirmable.  Further, any attempt by Astra to improperly setoff or collect on account of amounts allegedly owed by the Debtors is a violation of the automatic stay and prohibited.[72]

## II.    The Plan Satisfies Each Requirement for Confirmation.

63.    To confirm the Plan, the Bankruptcy Court must find that the Debtors have satisfied the provisions of section 1129 of the Bankruptcy Code by a preponderance of the evidence.[73]  As

---

[71]    The general bar date passed on November 13, 2023, subject to certain exceptions not applicable to Astra.  The For the avoidance of doubt, the Debtors reserve all rights with respect to the timeliness of the recently filed proofs of claim.

[72]    The automatic stay applies to "the setoff of any debt owing to the debtor that arose before the commencement of the case" 11 U.S.C. 362(a)(7); *see also U.S. v. Norton*, 717 F.2d 767, 771 (3d Cir. 1983) ("Before a setoff can be made against the debts owed by a petitioner in bankruptcy, a creditor must seek relief from the automatic stay").

[73]    *See In re Boy Scouts of Am.*, 137 F.4th 126, 158 n.18 (3d Cir. 2025) ("To confirm a consensual reorganization plan, on the other hand, the debtor must carry its burden of satisfying § 1129(a)'s sixteen statutory requirements by a preponderance of evidence.  And those requirements increase when a debtor seeks to "cram down" a plan over the objection of a nonconsenting impaired class." (citing *In re Armstrong World Indus., Inc.*, 348 B.R. 111, 120 (D. Del. 2006))); *In re Armstrong*, 348 B.R. at 120, n.15 (applying the preponderance of the evidence standard).

set forth herein, the Plan fully complies with all relevant sections of the Bankruptcy Code—including sections 1122, 1123, 1125, 1126, and 1129—as well as the Bankruptcy Rules and applicable non-bankruptcy law.

**A.    The Plan Complies with the Applicable Provisions of the Bankruptcy Code (§ 1129(a)(1)).**

64.    Section 1129(a)(1) of the Bankruptcy Code requires that a plan comply with the applicable provisions of the Bankruptcy Code.  The legislative history of section 1129(a)(1) of the Bankruptcy Code explains that this provision also encompasses the requirements of sections 1122 and 1123 of the Bankruptcy Code, which govern the classification of claims and the contents of a chapter 11 plan, respectively.[74]  As explained below, the Plan complies with the requirements of sections 1122, 1123, and 1129 of the Bankruptcy Code, as well as other applicable provisions.

**1.    The Plan Satisfies the Classification Requirements of Section 1122 of the Bankruptcy Code.**

65.    The classification requirement of section 1122(a) of the Bankruptcy Code provides, in pertinent part, as follows:

> Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.

66.    For a classification structure to satisfy section 1122 of the Bankruptcy Code, not all substantially similar claims or interests need to be grouped in the same class.[75]  Instead, claims or

---

[74]    S. Rep. No. 95-989, at 126, *reprinted in* 1978 U.S.C. C.A.N. 5787, 5912 (1978); H.R. Rep. No. 95-595, at 412, *reprinted in* 1978 U.S.C. C.A.N. 5963, 6368 (1977); *In re S&W Enter.*, 37 B.R. 153, 158 (Bankr. N.D. Ill. 1984) ("An examination of the Legislative History of [section 1129(a)(1)] reveals that although its scope is certainly broad, the provisions it was most directly aimed at were [s]ections 1122 and 1123."); *In re Nutritional Sourcing Corp.*, 398 B.R. 816, 824 (Bankr. D. Del. 2008).

[75]    *See In re Nuverra Env't Sols., Inc.*, 590 B.R. 75, 96 (D. Del. 2018) ("Section 1122 of the [Bankruptcy] Code provides that claims that are not 'substantially similar' may not be placed in the same class; it does not expressly prohibit placing 'substantially similar' claims in separate classes." (quoting *In re Coram Healthcare Corp.*, 315 B.R. 321, 348 (Bankr. D. Del. 2004))).

interests designated to a particular class must be substantially similar to each other.[76] Courts in this jurisdiction and others have recognized that plan proponents have significant flexibility in placing similar claims into different classes, provided there is a rational basis to do so.[77]

67.      The Plan's classification of Claims and Interests satisfies the requirements of section 1122 of the Bankruptcy Code because the Plan places Claims and Interests into nine separate Classes, with Claims and Interests in each Class differing from the Claims and Interests in each other Class in a legal or factual way or based on other relevant criteria.[78] Specifically, the Plan provides for the separate classification of Claims and Interests into the following Classes:

a.      <u>Class 1</u>:  Secured Tax Claims;

b.      <u>Class 2</u>:  Other Secured Claims;

c.      <u>Class 3</u>:  Other Priority Claims;

d.      <u>Class 4A</u>:  Employee PTO/Commission Full Pay GUC Claims;

e.      <u>Class 4B</u>:  Convenience Class Claims;

f.      <u>Class 5</u>:  General Unsecured Claims<u>;</u>

g.      <u>Class 6</u>:  Intercompany Claims;

h.      <u>Class 7</u>:  Intercompany Interests;

---

[76]    *Id.*

[77]    *Id.* Courts have identified grounds justifying separate classification, including (a) where members of a class possess different legal rights and (b) where there are good business reasons for separate classification. *See John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*, 987 F.2d 154, 158–59 (3d Cir. 1993) (holding that, as long as each class represents a voting interest that is "sufficiently distinct and weighty to merit a separate voice in the decision whether the proposed reorganization should proceed," the classification is proper); *In re Jersey City Med. Ctr.*, 817 F.2d 1055, 1061 (3d Cir. 1987) (recognizing that separate classes of claims must be reasonable and allowing a plan proponent to group similar claims in different classes); *see also Frito-Lay, Inc. v. LTV Steel Co. (In re Chateaugay Corp.)*, 10 F.3d 944, 956–57 (2d Cir. 1993) (finding separate classification appropriate because classification scheme had a rational basis on account of the bankruptcy court-approved settlement).

[78]    *See* Plan, Art. III.

      i.        <u>Class 8</u>:  Interests in Yellow Corporation;

      j.        <u>Class 9</u>:  Section 510(b) Claims.

68.     Claims and Interests assigned to each particular Class described above are substantially similar to the other Claims and Interests in each such Class.[79]  In addition, valid business, legal, and factual reasons justify the separate classification of the particular Claims or Interests into the Classes created under the Plan, and no unfair discrimination exists between or among Holders of Claims and Interests.[80]  Namely, the Plan separately classifies the Claims because each Holder of such Claims or Interests may hold (or may have held) rights in the Estates legally dissimilar to the Claims or Interests in other Classes or because substantial administrative convenience resulted from such classification.[81]

69.     For example, the classification scheme distinguishes Holders of Other Secured Claims (Class 2) from Holders of General Unsecured Claims (Class 5) because of the different circumstances of each Class, including that the Debtors' obligations with respect to the former are secured by collateral.[82]  Other Priority Claims (Class 3) are classified separately due to their required treatment under the Bankruptcy Code.[83]  Employee PTO/Commission Full Pay GUC Claims (Class 4A) are classified separately for administrative benefit in the interest of cost savings

---

[79]     *See* Whittman Declaration ¶ 25.

[80]     *See Id*.

[81]     *See* Plan, Art. III; *see also In re Aleris Int'l, Inc.*, No. 09-10478, 2010 WL 3492664, at *12-13 (Bankr. D. Del. May 13, 2010) (noting that a convenience class representing 63.5% of general unsecured claims and 1.75% of in amount of general unsecured claims reduces "the administrative burden and expense of making multiple distributions"); *In re Capmark Fin. Grp. Inc.*, No. 09-13684, 2011 WL 6013718 at *8, 22 (Bankr. D. Del. Aug. 24, 2011) (noting that preventing multiple distributions to small unsecured creditors comports with the intent of section 1122(b)).

[82]     *See* Plan, Art. III.

[83]     *See* Plan, Art. III.

for the Debtors' Estates; the holders of such claims will be entitled to satisfaction of their Allowed General Unsecured Claims to ease the Debtors' administrative burden, including the Debtors' potential burden of needing to adjudicate their position on the division of employee-related claims between Priority Claims under section 507(a)(4) of the Bankruptcy Code and non-Priority Claims.[84]

70.      Furthermore, Convenience Class Claims (Class 4B) are classified separately for administrative benefit; the holders of Convenience Class Claims, either by amount or election, will be entitled to satisfaction of their Allowed General Unsecured Claim to ease the administrative burden on the Debtors in the interest of cost savings for the Estates.[85]   Under Section 1122(b), courts look to whether the convenience class at issue "reduces the administrative burden and expense" in administering the chapter 11 case.[86]   The classification of Class 4B (Convenience Class Claims) and the ability of Holders of Class 5 Claims (General Unsecured Claims) to elect to have their claim treated as a Convenience Class Claim is appropriate here, as the Convenience Class was designed to address the claims of numerous and small creditors.   Courts in this Circuit and others have approved chapter 11 plans with convenience classes similar to Class 4B, including with similar and higher threshold amounts.[87]

---

[84]     *See* Plan, Art. III; *see also* 11 U.S.C. § 507(a)(4).

[85]     *See Aleris*, 2010 WL 3492664, at *13 (convenience class treatment "reduces the administrative burden and expense of making multiple distributions," satisfying section 1122(b) of the Bankruptcy Code.).

[86]     *See Aleris*, 2010 WL 342664, at *12-13 (noting that a convenience class representing 63.5% of general unsecured claims and 1.75% of in amount of general unsecured claims, reduces "the administrative burden and expense of making multiple distributions"); *In re Capmark*, 2011 WL 6013718 at 8, 22 (noting that preventing multiple distributions to small unsecured creditors comports with the intent of section 1122(b)).

[87]     *See, e.g., In re TMP Directional Mktg., LLC*, No. 11-13835 (MFW) (Bankr. D. Del. Jan. 17, 2012) (approving a chapter 11 plan with a convenience class, with a convenience claim threshold amount of $50); *In re Armstrong World Indus., Inc.*, 348 B.R. 136, 168 (D. Del. 2006) (approving a chapter 11 plan with a convenience class over an objection related to unfair discrimination); see also *In re Invitae Corp.* No. 24-11362 (MBK) (Bankr. D.N.J. Aug. 2, 2024) (approving a chapter 11 plan with a convenience class); *In re BlockFi Inc.*, No. 22-19361 (MBK)

71.     Accordingly, the Claims or Interests assigned to each particular Class described above are substantially similar to the other Claims or Interests in each such Class and the distinctions among Classes are based on valid factual and legal distinctions.  The Debtors submit that the Plan fully complies with and satisfies section 1122 of the Bankruptcy Code.  No party has asserted otherwise.

### 2.      The Plan Satisfies the Mandatory Plan Requirements of Section 1123(a) of the Bankruptcy Code.

72.     The seven applicable requirements of section 1123(a) of the Bankruptcy Code generally relate to the specification of claims treatment and classification, the equal treatment of claims within classes, and the mechanics of implementing a plan.  The Plan satisfies each of these requirements.

*(1)     Designation of Classes of Claims and Equity Interests (§ 1123(a)(1))*

73.     Section 1123(a)(1) of the Bankruptcy Code requires that the Plan designate "classes of claims, other than claims of a kind specified in section 507(a)(2), 507(a)(3), or 507(a)(8) of this title, and classes of interest."[88]  For the reasons set forth above, Article III of the Plan properly

---

(Bankr. D.N.J. Oct. 3, 2023) (same); *In re Celsius Network, LLC*, No. 22-10964 (MG) (Bankr. S.D.N.Y. Nov. 9, 2023) (approving a chapter 11 plan with a convenience class, with a convenience claim threshold amount of $250,000); *In re Intelsat S.A.*, No. 20-32299 (KLP) (Bankr. E.D. Va. Dec. 17, 2021) (approving a chapter 11 plan with a convenience class, with a convenience claim threshold amount of $1,000,000); *In re Gulfport Energy Corp.*, No. 20-35562 (DRJ) (Bankr. S.D. Tex. Apr. 27, 2021) (approving a chapter 11 plan with a convenience class, with a convenience claim threshold amount of $300,000); *In re Chesapeake Energy Corp.*, No. 20-33233 (DRJ) (Bankr. S.D. Tex. Jan. 16, 2021) (approving a chapter 11 plan with a convenience class, with a convenience claim threshold amount of $1,000,000); *In re Tailored Brands, Inc.*, No. 20-33900 (MI) (Bankr. S.D. Tex. Nov. 13, 2020) (approving a chapter 11 plan with a convenience class, with a convenience claim threshold amount of $500); *In re LINN Energy, LLC*, No. 16-60040 (DRJ) (Bankr. S.D. Tex. Jan. 27, 2017) (approving a chapter 11 plan with a convenience class, with a convenience claim threshold amount of $2,500); *In re CJ Holding Co.*, No. 16-33590 (DRJ) (Bankr. S.D. Tex. Dec. 16, 2016) (approving a chapter 11 plan with a convenience class, with a convenience claim threshold amount of $15,000); *In re Penn. Va. Corp.*, No. 16-32395 (KLP) (Bankr. E.D. Va. Aug. 16, 2016) (approving a chapter 11 plan with a convenience class, with a convenience claim threshold amount of $2,500,000).

[88]     11 U.S.C. §1123(a)(1).

designates classes of Claims and Interests and thus satisfies the requirement of section 1122 of the Bankruptcy Code.[89]  No party has asserted otherwise.

*(2)        Specification of Unimpaired Classes (§ 1123(a)(2))*

74.    Section 1123(a)(2) of the Bankruptcy Code requires that a plan "specify any class of claims or interests that is not impaired under the plan."  The Plan meets this requirement by identifying each Class in Article III that is Unimpaired.[90]  No party has asserted otherwise.

*(3)        Treatment of Impaired Classes (§ 1123(a)(3))*

75.    Section 1123(a)(3) of the Bankruptcy Code requires that a plan "specify the treatment of any class of claims or interests that is impaired under the plan."  The Plan meets this requirement by setting forth the treatment of each Class in Article III that is Impaired.[91] No party has asserted otherwise.

*(4)        Equal Treatment within Classes (§ 1123(a)(4))*

76.    Section 1123(a)(4) of the Bankruptcy Code requires that a plan "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest."[92]  The Plan satisfies this requirement because Holders of Allowed Claims or Interests will receive the same rights and treatment as other Holders of Allowed Claims or Interests within such Holders' respective Class.[93]  No party has asserted otherwise.

---

[89]    *See* Plan, Art. III.A.

[90]    *See* Plan, Art. III.A.

[91]    *See* Plan, Art. III.A.

[92]    11 U.S.C. § 1123(a)(4).

[93]    *See* Plan, Art. III.B.

*(5)      Means for Implementation (§ 1123(a)(5))*

77.      Section 1123(a)(5) of the Bankruptcy Code requires that a plan provide "adequate means" for its implementation.[94]  The Plan, together with the documents and forms of agreement included in the Plan Supplement, provides a detailed blueprint for the transactions that underlie the Plan, which are focused on an orderly wind-down of the Debtors' Estates and the establishment of the Liquidating Trust for the purpose of maximizing the value of the Liquidating Trust Assets, making distributions, and resolving Disputed Claims.

78.      Article IV of the Plan, in particular, sets forth the means for implementation of the Plan, which include, *inter alia*: (a) general settlement of Claims and Interests; (b)  the Third-Party Sale Transactions; (c) the establishment of the Liquidating Trust pursuant to the Liquidating Trust Agreement;  (d) the sources of consideration for Plan distributions; and (e) appointment of the Liquidating Trustee and the vesting of assets in the Liquidating Trust.[95].  In addition to these core means for implementation, the Plan sets forth other critical mechanics of the Debtors' wind-down, such as the dissolution of the Debtors and the cancellation of securities and agreements.

79.      The precise terms governing the execution of these transactions are set forth in the applicable definitive documents or forms of agreements included in the Plan Supplement. The Debtors believe that the Plan satisfies section 1123(a)(5) of the Bankruptcy Code.  No party has asserted otherwise.

---

[94]      11 U.S.C. § 1123(a)(5).

[95]      *See* Plan, Art. IV.

*(6)     Issuance of Non-Voting Securities (§ 1123(a)(6))*

80.     Section 1123(a)(6) of the Bankruptcy Code requires that a debtor's corporate constituent documents prohibit the issuance of nonvoting equity securities.[96] Because the Debtors are not issuing any new securities under the Plan, section 1123(a)(6) of the Bankruptcy Code does not apply to the Plan.

*(7)     Directors and Officers (§ 1123(a)(7))*

81.     Section 1123(a)(7) of the Bankruptcy Code requires that plan provisions with respect to the manner of selection of any director, officer, or trustee, or any other successor thereto, be "consistent with the interests of creditors and equity security holders and with public policy."[97] The Plan satisfies this requirement by providing for the deemed resignation of the Debtors' directors and officers from their duties following the Effective Date.[98] The Plan also provides for the appointment of the Liquidating Trustee as the trustee and administrator of the Liquidating Trust, established pursuant to the Plan.[99] On the Effective Date, the Liquidating Trust Board of Managers, consisting of five voting managers, will also be appointed in accordance with the terms of the Plan and the Liquidating Trust Agreement.[100] The Liquidating Trust Board of Managers shall always act consistently with, and not contrary to, the purpose of the Liquidating Trust as set forth in the Plan.[101] The Liquidating Trust and its governance by the Liquidating Trustee and

---

[96]   11 U.S.C. § 1123(a)(6).

[97]   *See* 11 U.S.C. § 1123(a)(7).

[98]   *See* Plan, Art. IV.J.

[99]   *See* Plan, Art. IV.D and Art. IV.G.

[100]   *See* Plan, Art. VIII.A.

[101]   *See* Plan, Art. VIII.A.

Liquidating Trust Board of Managers will be established for the primary purpose of maximizing the value of its assets and making distributions in accordance with the Plan, Proposed Confirmation Order, and Liquidating Trust Agreement and consistent with the interests of Holders of Claims and Interests that are entitled to receive Liquidating Trust Interests, including with respect to resolving any Disputed Claims not resolved prior to the Effective Date.[102]

**B.      The Debtors Complied with the Applicable Provisions of the Bankruptcy Code (§ 1129(a)(2)).**

82.      The Debtors have satisfied section 1129(a)(2) of the Bankruptcy Code, which requires plan proponents to comply with the applicable provisions of the Bankruptcy Code.[103] The legislative history to section 1129(a)(2) provides that section 1129(a)(2) is intended to encompass the disclosure and solicitation requirements set forth in section 1125 and the plan acceptance requirements set forth in section 1126 of the Bankruptcy Code.[104] As set forth herein, the Debtors have complied with these provisions, including sections 1125 and 1126 of the Bankruptcy Code, as well as Bankruptcy Rules 3017 and 3018, by distributing the Disclosure Statement and soliciting acceptances of the Plan through their Claims and Noticing Agent in accordance with the Disclosure Statement Order.

---

[102]    *See* Plan, Art. VIII.B.

[103]    *See* 11 U.S.C. § 1129(a)(2).

[104]    *See In re Lapworth*, No. 97-34529 1998 WL 767456, at *3 (DWS) (Bankr. E.D. Pa. Nov. 2, 1998) ("The legislative history of § 1129(a)(2) specifically identifies compliance with the disclosure requirements of § 1125 as a requirement of § 1129(a)(2)."); *Aleris*, 2010 WL 3492664, at *20 ("[S]ection 1129(a)(2) of the Bankruptcy Code reflects that this provision is intended to encompass the solicitation and disclosure requirements under sections 1125 and 1126 of the Bankruptcy Code."); S. Rep. No. 989, 95th Cong., 2d Sess., at 126 (1978); H.R. Rep. No. 595, 95th Cong., 1st Sess., at 412 (1977).

1.      **The Debtors Complied with Section 1125 of the Bankruptcy Code.**

83.      Section 1125 of the Bankruptcy Code prohibits the solicitation of acceptances or rejections of a chapter 11 plan "unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information."[105]  Section 1125 of the Bankruptcy Code ensures that parties in interest are fully informed regarding a debtor's condition so that they may make an informed decision whether to approve or reject the plan.[106]

84.      Section 1125 is satisfied here.  Before the Debtors solicited votes on the Plan, the Bankruptcy Court approved the Disclosure Statement in accordance with section 1125(a)(1).[107] The Bankruptcy Court also approved the contents of the Solicitation Packages provided to Holders of Claims entitled to vote on the Plan, the non-voting materials provided to parties not entitled to vote on the Plan, and the relevant deadlines for voting on and objecting to the Plan.[108]  As stated above, the Debtors, through their Claims and Noticing Agent, complied with the content and delivery requirements of the Disclosure Statement Order,[109] thereby satisfying sections 1125(a) and (b) of the Bankruptcy Code.  The Debtors also satisfied section 1125(c) of the Bankruptcy Code, which provides that the same disclosure statement must be transmitted to each holder of a claim or interest in a particular class.  Here, the Debtors caused a Solicitation

---

[105]      11 U.S.C. § 1125(b).

[106]      *See Momentum Mfg. Corp. v. Emp. Creditors Comm. (In re Momentum Mfg. Corp.)*, 25 F.3d 1132, 1136 (2d Cir. 1994) (finding that section 1125 of the Bankruptcy Code obliges a debtor to engage in full and fair disclosure that would enable a hypothetical reasonable investor to make an informed judgment about the plan).

[107]      *See generally* Disclosure Statement Order.

[108]      *See generally* Disclosure Statement Order.

[109]      *See* Solicitation Affidavit.

Package or a Notice of Non-Voting Status and Opt-In Form, as applicable, each of which included instructions for accessing electronic or hard-copy versions of the Disclosure Statement, to be transmitted to each Holder of a Claim or Interest.[110]

85.     Based on the foregoing, the Debtors submit that they have complied in all respects with the solicitation requirements of section 1125 of the Bankruptcy Code and the Disclosure Statement Order.  No party has asserted otherwise.

**2.     The Debtors Complied with Section 1126 of the Bankruptcy Code.**

86.     Section 1126 of the Bankruptcy Code specifies the requirements for acceptance of a chapter 11 plan.  Specifically, under section 1126 of the Bankruptcy Code, only holders of allowed claims and equity interests in impaired classes of claims or interests that will receive or retain property under a plan on account of such claims or interests may vote to accept or reject such plan.  Section 1126 of the Bankruptcy Code provides, in pertinent part, that:

> (a)     The holder of a claim or interest allowed under section 502 of [the Bankruptcy Code] may accept or reject a plan . . . .
>
> (f)     Notwithstanding any other provision of this section, a class that is not impaired under a plan, and each holder of a claim or interest of such class, are conclusively presumed to have accepted the plan, and solicitation of acceptances with respect to such class from the holders of claims or interests of such class is not required.
>
> (g)     Notwithstanding any other provision of this section, a class is deemed not to have accepted a plan if such plan provides that the claims or interests of such class do not entitle the holders of such claims or interests to receive any property under the plan on account of such claims or interests.[111]

---

[110]   *See* Solicitation Affidavit.

[111]   11 U.S.C. § 1126(a), (f), (g).

87.    As set forth above, in accordance with section 1125 of the Bankruptcy Code, the Debtors solicited acceptances or rejections of the Plan from the Holders of Allowed Claims in Class 5 (General Unsecured Claims).  The Debtors did not solicit votes from Holders of Claims and Interests in Class 1 (Secured Tax Claims), Class 2 (Other Secured Claims), Class 3 (Other Priority Claims), Class 4A (Employee PTO/Commission Full Pay GUC Claims), Class 4B (Convenience Class Claims) because Holders of Claims in these Classes are Unimpaired and, pursuant to section 1126(f) of the Bankruptcy Code, are conclusively presumed to have accepted the Plan.[112]

88.    Finally, it is not anticipated that Holders of Claims and Interests in Class 6 (Intercompany Claims), Class 7 (Intercompany Interests), Class 8 (Interests in Yellow Corporation), and Class 9 (Section 510(b) Claims) will receive any distribution on account of their Claims or Interests and, pursuant to section 1126(g) of the Bankruptcy Code, are therefore deemed to reject the Plan.[113]  Thus, pursuant to section 1126(a) of the Bankruptcy Code, only Holders of Claims in Class 5 were entitled to vote to accept or reject the Plan.[114]

89.    With respect to the Voting Class, section 1126(c) of the Bankruptcy Code provides that a class accepts a plan where holders of claims holding at least two-thirds in amount and more than one-half in number of allowed claims in such class vote to accept such plan.

---

[112]    *See* Plan, Art. III.B.

[113]    *See* Plan, Art. III.B.

[114]    *See* Plan, Art. III.B; *see also* Solicitation Affidavit.

90.     The Voting Report reflects the results of the voting process in accordance with section 1126 of the Bankruptcy Code.[115]  As set forth in the Voting Report, Class 5 (General Unsecured Claims) voted to accept the Plan.  Based on the foregoing, the Debtors submit that they have satisfied the requirements of section 1129(a)(2) of the Bankruptcy Code.  No party has asserted otherwise.

### C.    The Plan Was Proposed in Good Faith (§ 1129(a)(3)).

91.     Section 1129(a)(3) of the Bankruptcy Code requires that a chapter 11 plan be "proposed in good faith and not by any means forbidden by law."  Where a plan satisfies the purposes of the Bankruptcy Code and has a good chance of succeeding, the good faith requirement of section 1129(a)(3) of the Bankruptcy Code is satisfied.[116]  To determine whether a plan seeks relief consistent with the Bankruptcy Code, courts consider the totality of the circumstances surrounding the development of the plan.[117]

---

[115]    *See generally* Voting Report.

[116]    *See, e.g.*, *In re PWS Holding Corp.*, 228 F.3d 224, 242 (3d Cir. 2000) ("[F]or purposes of determining good faith under section 1129(a)(3) ... the important point of inquiry is the plan itself and whether such a plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code." (quoting *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 150 n.5 (3d Cir. 1986)); *see also In re NII Holdings, Inc.*, 288 B.R. 356, 362 (Bankr. D. Del. 2002) ("[T]he Plan has been proposed with the legitimate purpose of reorganizing the business affairs of each of the Debtors and maximizing the returns available to creditors of the Debtors.  Accordingly, the Plan satisfies the requirements of section 1129(a)(3) of the Bankruptcy Code."); *accord In re T-H New Orleans Ltd. P'ship*, 116 F.3d 790, 802 (5th Cir. 1997) ("Where the plan is proposed with the legitimate and honest purpose to reorganize and has a reasonable hope of success, the good faith requirement of § 1129(a)(3) is satisfied." (quoting *In re Sun Country Dev., Inc.*, 764 F.2d 406, 408 (5th Cir. 1985)).

[117]    *E.g.*, *In re W.R. Grace & Co.*, 475 B.R. 34, 87 (D. Del. 2012) ("[A] determination of good faith associated with a Chapter 11 reorganization plan requires a factual inquiry into a totality of the circumstances surrounding the plan's proposal." (citing *In re Sun Country Dev., Inc.*, 764 F. 2d at 408)); *In re Century Glove, Inc.*, 1993 WL 239489, at *4 (D. Del. Feb. 10, 1993) ("The requirement of good faith must be viewed in light of the totality of the circumstances surrounding establishment of a Chapter 11 plan, keeping in mind the purpose of the Bankruptcy Code is to give debtors a reasonable opportunity to make a fresh start." (citing *In re Sun Country Dev., Inc.*, 764 F.2d at 408)); *T-H New Orleans*, 116 F.3d at 802 (same).

92.     The Debtors negotiated, developed, and jointly proposed the Plan with the Committee with the unified goal of maximizing the value of the Debtors' Estates and providing recoveries to creditors.  The Plan is the product of extensive, good-faith, arm's-length negotiations among the Debtors, the Committee, and other stakeholders of the Debtors, with all parties working towards a value-maximizing outcome.[118]  Accordingly, the Plan has been proposed in good faith and not by any means forbidden by law and satisfies section 1129(a)(3) of the Bankruptcy Code.

**D.     The Plan Provides that the Debtors' Payment of Professional Fees and Expenses Are Subject to Court Approval (§ 1129(a)(4)).**

93.     Section 1129(a)(4) of the Bankruptcy Code requires that certain fees and expenses paid by the plan proponent, by the debtor, or by a person receiving distributions of property under the plan, be subject to approval by the Bankruptcy Court as reasonable.  Courts have construed this section to require that all payments of professional fees paid out of estate assets be subject to review and approval by the Bankruptcy Court as to their reasonableness.[119]

94.     The Plan satisfies section 1129(a)(4) of the Bankruptcy Code.  All payments made or to be made by the Debtors for services or for costs or expenses in connection with these Chapter 11 Cases prior to the Effective Date, including all Professional Fee Claims, have been approved by, or are subject to approval of, the Bankruptcy Court.[120]  The Plan provides that all final requests for payment of Professional Fee Claims must be filed no later than forty-five days

---

[118]     *See* Whittman Declaration ¶ 22.

[119]     *See In re Lisanti Foods, Inc.*, 329 B.R. 491, 503 (D.N.J. 2005) ("Pursuant to § 1129(a)(4), a [p]lan should not be confirmed unless fees and expenses related to the [p]lan have been approved, or are subject to the approval, of the Bankruptcy Court."); *In re Future Energy Corp.*, 83 B.R. 470, 488 (Bankr. S.D. Ohio 1988) (holding that fees and expenses related to the plan are subject to the approval by the bankruptcy court); *In re Chapel Gate Apartments, Ltd.*, 64 B.R. 569, 573 (Bankr. N.D. Tex. 1986) (noting that before a plan may be confirmed, "there must be a provision for review by the Court of any professional compensation").

[120]     *See* Plan, Art. II.

after the Effective Date and are subject to approval by the Bankruptcy Court after notice and a hearing.[121]   Accordingly, the Plan fully complies with the requirements of section 1129(a)(4) of the Bankruptcy Code.  No party has asserted otherwise.

   **E.    The Debtors Have Complied with the Governance Disclosure Requirement (§ 1129(a)(5)).**

   95.     Section 1129(a)(5)(A)(ii) of the Bankruptcy Code requires a plan proponent to disclose the identity and affiliation of any individual proposed to serve as a director or officer of the debtor or a successor to the debtor under the plan and that the appointment or continuance of such officers and directors be consistent with the interests of creditors and equity security holders and public policy.[122]

   96.     The Plan satisfies section 1129(a)(5).  Article VII of the Plan provides for the creation of a Liquidating Trust.  In accordance with the Plan and the Liquidating Trust Agreement, and in consultation with the Committee, five managers will be appointed to a Liquidating Trust Board of Managers to manage the affairs of the Liquidating Trust.  The Liquidating Trust Agreement provides that the Liquidating Trustee shall, among other things, be authorized to exercise all power and authority that may be or could have been commenced by any of the persons acting as directors and officers of the Debtors or their estates.  The identities of the Liquidating Trustee and the Liquidating Trust Board of Managers is set forth in the First Amended Plan Supplement.[123]   Accordingly, the Plan fully complies with and satisfies all of the requirements of section 1129(a)(5) of the Bankruptcy Code.

---

[121]   *See* Plan, Art. II.B.

[122]   11 U.S.C. § 1129(a)(5)(A).

[123]   *See* First Amended Plan Supplement, Docket No. 7798.

### F.     The Plan Does Not Require Governmental Regulatory Approval (§ 1129(a)(6)).

97.     Section 1129(a)(6) of the Bankruptcy Code requires that any rate change provided for in a plan be approved by or subject to the approval of all governmental regulatory commissions with jurisdiction, if any.  The Plan does not provide for any rate changes, and the Debtors are not subject to any such regulation.  Thus, section 1129(a)(6) of the Bankruptcy Code does not apply to the Plan.

### G.     The Plan Is in the Best Interests of All the Debtors' Creditors (§ 1129(a)(7)).

98.     Section 1129(a)(7) of the Bankruptcy Code, commonly known as the "best interests test," requires that, with respect to each impaired class of claims or interests, each individual holder of a claim or interest has either accepted the plan or will receive or retain property having a value of not less than the value such holder would receive if the debtor were liquidated under chapter 7 of the Bankruptcy Code.  The best interests test applies to individual dissenting holders of impaired claims and interests rather than classes and is generally satisfied through a comparison of the estimated recoveries for a debtor's stakeholders in a hypothetical chapter 7 liquidation of that debtor's estate against the estimated recoveries under that debtor's chapter 11 plan.[124]

99.     The Plan satisfies section 1129(a)(7) of the Bankruptcy Code and the best interests test.  As discussed in more detail in Section I.A.1 above and in the Whittman Declaration, the Debtors' quantitative liquidation analysis demonstrates that each Debtor provides to applicable creditors a recovery in chapter 7 that is less than what said creditors would receive under the Plan.

---

[124]     *See Bank of Am. Nat. Trust & Savs. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 442 n.13 (1999) ("The 'best interests' test applies to individual creditors holding impaired claims, even if the class as a whole votes to accept the plan."); *see also In re Stone & Webster, Inc.*, 286 B.R. 532, 544–45 (Bankr. D. Del. 2002) ("The application of the best interest test involves a hypothetical application of chapter 7 to a chapter 11 plan.  A liquidation and distribution analysis is performed to see whether each holder of a claim or interest in each impaired class, as such classes are defined in the subject plan, receive not less than the holders would receive in a 'hypothetical Chapter 7 distribution' to those classes." (citation omitted)).

Specifically, the analysis demonstrates that, in the initial instance, each Debtor provides to applicable creditors a recovery in chapter 7 that is less than what said creditors would receive under the Plan other than for the Affected Debtors.[125] However, given that all but the Affected Debtors receive superior recoveries under the Plan, conversion of *all* 24 Debtor entities to chapter 7 would be illogical and such a scenario would instead prompt the Debtors to convert only the three Affected Debtor cases to chapter 7, with each Affected Debtor being properly burdened by the incremental costs of a chapter 7.[126] As explained in Section I.A.1 above, if only the Affected Debtors are liquidated through chapter 7 separate from the other Debtor entities, Holders of Class 4A, Class 4B, and Class 5 Claims at the three Affected Debtors actually receive no recovery under the hypothetical chapter 7 because all available Distributable Proceeds at the Affected Debtors would likely be wholly consumed by Administrative and Priority Claims and chapter 7 administration fees and expenses.[127]

100.    Furthermore, since each Holder of a Class 5 Claim was given the option under the Plan to elect to have their Claim treated as a Convenience Class Claim, given the size of the non-joint & several claims at the three Affected Debtors, the Plan provided that all such Holders of Class 5 Claims were able to receive more under the Plan than they would receive in a hypothetical liquidation, subject only to their individual decision as to whether to make such Convenience Claim Election.[128] In addition, the appointment of a chapter 7 trustee would almost

---

[125]    *See* Whittman Declaration ¶ 44.

[126]    *Id*.

[127]    *Id*.

[128]    *Id*.

certainly delay distributions to creditors, thus reducing the present value of any recovery for Holders and the Debtors' Estates would continue to be obligated to pay all unpaid expenses incurred by the Debtors and the Committee during the Chapter 11 Cases.[129]

101.    In sum, a chapter 7 liquidation would result in reduced Distributable Proceeds and recoveries, increased expenses, delayed distributions, and the prospect of additional Claims that were not asserted in these Chapter 11 Cases.[130] Accordingly, the Plan satisfies section 1129(a)(7) of the Bankruptcy Code.

### H.    The Plan Is Confirmable Notwithstanding the Requirements of Section 1129(a)(8) of the Bankruptcy Code.

102.    Section 1129(a)(8) of the Bankruptcy Code requires that each class of claims or interests must either accept a plan or be unimpaired under a plan.  If not, the plan must satisfy the "cram down" requirements of section 1129(b) of the Bankruptcy Code with respect to the claims or interests in that class.  Pursuant to section 1126(c) of the Bankruptcy Code, a class of claims accepts a plan if holders of at least two thirds in amount and more than one half in number of the allowed claims in that class vote to accept the plan.

103.    As set forth above and as reflected in the Voting Report, Class 5 is Impaired and has voted to accept the Plan.  As such, there is an Impaired consenting Class that affirmatively voted to accept the Plan.  Classes 1, 2, 3, 4A, and 4B are presumed to have accepted the Plan. Holders of Claims and Interests in Classes 6, 7, 8 and 9 are Impaired, were not entitled to vote, and are deemed to have rejected the Plan.  Notwithstanding such deemed rejections, the Debtors

---

[129]    *See* Whittman Declaration ¶ 45.

[130]    *See* Whittman Declaration ¶ 46.

meet the requirements of section 1129(b) of the Bankruptcy Code to "cram down" these rejecting classes.  No party has asserted otherwise.

**I.    The Plan Provides for Payment in Full of All Allowed Priority Claims (§ 1129(a)(9)).**

104.    Section 1129(a)(9) of the Bankruptcy Code requires that certain priority claims be paid in full on the effective date of a plan and that the holders of certain other priority claims receive deferred cash payments.  In particular, pursuant to section 1129(a)(9)(A) of the Bankruptcy Code, holders of claims of a kind specified in section 507(a)(2) of the Bankruptcy Code— administrative claims allowed under section 503(b) of the Bankruptcy Code—must receive on the effective date cash equal to the allowed amount of such claims.  Section 1129(a)(9)(B) of the Bankruptcy Code requires that each holder of a claim of a kind specified in section 507(a)(1) or (4) through (7) of the Bankruptcy Code—generally wage, employee benefit, and deposit claims entitled to priority—must receive deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amount of such claim (if such class has accepted the plan), or cash of a value equal to the allowed amount of such claim on the effective date of the plan (if such class has not accepted the plan).  Finally, section 1129(a)(9)(C) of the Bankruptcy Code provides that the holder of a claim of a kind specified in section 507(a)(8) of the Bankruptcy Code—*i.e.*, priority tax claims—must receive cash payments over a period not to exceed five years from the petition date, the present value of which equals the allowed amount of the claim.

105.    The Plan satisfies section 1129(a)(9) of the Bankruptcy Code.  ***First***, Article II.A of the Plan satisfies section 1129(a)(9)(A) of the Bankruptcy Code because it provides that each holder of an Allowed Administrative Claim will receive payment in an amount of Cash equal to the amount of the unpaid portion of such Allowed Administrative Claim in accordance with the following:  (a) if such Administrative Claim is Allowed on or prior to the Effective Date, on the

49

Effective Date (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (b) if such Administrative Claim is not Allowed as of the Effective Date, no later than thirty days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (c) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in accordance with the terms and conditions of the particular transaction or course of business giving rise to such Allowed Administrative Claim, without any further action by the Holder of such Allowed Administrative Claim; (d) at such time and upon such terms as may be agreed upon by the Holder of such Allowed Administrative Claim and the Debtors and the Committee or as otherwise contemplated by the Liquidating Trust Agreement; or (e) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court.[131]

106.    *Second*, the Plan satisfies section 1129(a)(9)(B) of the Bankruptcy Code because no Holders of the types of Allowed Claims specified by 1129(a)(9)(B) are Impaired under the Plan.[132] More specifically, under Article III.B of the Plan, except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment, in exchange for such Allowed Other Priority Claim, on the first Distribution Date after the later to occur of (i) the Effective Date and (ii) the date such Claim becomes Allowed (or as otherwise set forth in the Plan), each Holder

---

[131]    *See* Plan, Art. II.A.

[132]    *See* Whittman Declaration ¶ 24.

of an Allowed Other Priority Claim, will either be satisfied in full, in Cash, or otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.[133]

107.   ***Third***, Article II.C of the Plan satisfies section 1129(a)(9)(C) of the Bankruptcy Code because it provides that Holders of Allowed Priority Tax Claims shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.[134]  The Plan thus satisfies each of the requirements of section 1129(a)(9) of the Bankruptcy Code.  No party has asserted otherwise.

## J.   At Least One Class of Impaired, Non-Insider Claims Accepted the Plan (§ 1129(a)(10)).

108.   Section 1129(a)(10) of the Bankruptcy Code provides that, to the extent there is an impaired class of claims, at least one impaired class of claims must accept the plan, "without including any acceptance of the plan by any insider," as an alternative to the requirement under section 1129(a)(8) of the Bankruptcy Code that each class of claims or interests must either accept the plan or be unimpaired under the plan.  As detailed herein and in the Voting Report, the Debtors have obtained the requisite acceptance to confirm the Plan.  Holders of Class 5 General Unsecured Claims voted to accept the Plan, independent of any insiders' votes.[135]  Accordingly, the Plan satisfies the requirements of section 1129(a)(10) of the Bankruptcy Code.  No party has asserted otherwise.

---

[133]   *See* Plan, Art. III.B.

[134]   *See* Plan, Art. II.C.

[135]   *See generally*, Voting Report.

### K.    The Plan Is Feasible (§ 1129(a)(11)).

109.    Section 1129(a)(11) of the Bankruptcy Code requires that the Bankruptcy Court find that a plan is feasible as a condition precedent to confirmation.  Specifically, the Bankruptcy Court must determine that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan."[136] To demonstrate that a plan is feasible, it is not necessary for a debtor to guarantee success.[137] Rather, a debtor must provide only a reasonable assurance of success.[138]  There is a relatively low threshold of proof necessary to satisfy the feasibility requirement.[139]

110.    Here, the Plan contemplates the implementation of the Liquidation Transactions and orderly liquidation and monetization of Liquidating Trust Assets by the Liquidating Trustee, with proceeds being distributed pursuant to the Plan.  As set forth in the Whittman Declaration, the Debtors have sufficient funds to implement and complete the distributions and obligations under the Plan.[140]    As set forth in Articles III.H of the Disclosure Statement, the Distributable

---

[136]    11 U.S.C. § 1129(a)(11).

[137]    *In re Flintkote Co.*, 486 B.R. 99, 139 (Bankr. D. Del. 2012) (stating that the bankruptcy court "need not require a guarantee of success" (citations omitted) (internal quotation marks omitted)); *In re W.R. Grace & Co.*, 475 B.R. at 115 (same); *accord Kane v. Johns-Manville Corp.*, 843 F.2d 636, 649 (2d Cir. 1988) ("[T]he feasibility standard is whether the plan offers a reasonable assurance of success.  Success need not be guaranteed.").

[138]    *See Kane*, 843 F.2d at 649; *Flintkote Co.*, 486 B.R. at 139; *W.R. Grace & Co.*, 475 B.R. at 115; *see also In re Pizza of Hawaii, Inc.*, 761 F.2d 1374, 1382 (9th Cir. 1985) (holding that "[t]he purpose of section 1129(a)(11) is to prevent confirmation of visionary schemes which promise creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation") (citations omitted); *accord In re Capmark Fin. Grp.*, No. 90-13684, 2011 WL 6013718, at *61 (Bankr. D. Del. Aug. 24, 2011) (same).

[139]    *See, e.g.*, *In re Tonopah Solar Energy, LLC*, 657 B.R. 393, 410 (D. Del. 2022) ("As Debtor correctly notes, [plan feasibility] is a low threshold."); *In re Prussia Assocs.*, 322 B.R. 572, 584 (Bankr. E.D. Pa. 2005) ("The Code does not require the debtor to prove that success is inevitable, and a relatively low threshold of proof will satisfy § 1129(a)(11) so long as adequate evidence supports a finding of feasibility." (internal citation omitted)).

[140]    *See* Whittman Declaration, ¶ 48.

Proceeds are estimated to be between $600 million and $700 million, assuming an Effective Date on or about November 30, 2025.  The Debtors shall fund the distributions and obligations with (a) all Cash on hand held by the Debtors on the Effective Date; (b) net Cash proceeds generated by the, sale, lease, liquidation or other disposition of Estate property, including Third-Party Sale Transactions; (c) Cash proceeds generated by the use, sale, lease, liquidation or other disposition of any property belonging to the Liquidating Trust; (d) Cash proceeds generated from the Debtors' and the Estates' accounts receivable; and (e) Cash proceeds from the Debtors' and the Estates' Causes of Action.

111.    Further, as set forth more fully in Articles II.B.2 and II.B.3 of the Plan, as soon as reasonably practicable after the Confirmation Date and no later than the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Escrow Amount.  The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals and for no other Entities until all Professional Fee Claims Allowed by the Bankruptcy Court have been indefeasibly paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court.

112.    Accordingly, the Debtors submit that the Plan fully complies with and satisfies all of the requirements of section 1129(a)(11) of the Bankruptcy Code.  No party has asserted otherwise.

**L.    The Plan Provides for the Payment of Certain Statutory Fees (§ 1129(a)(12)).**

113.    Section 1129(a)(12) of the Bankruptcy Code requires the payment of "[a]ll fees payable under section 1930 of title 28 [of the United States Code], as determined by the court at the hearing on confirmation of the plan."  Section 507(a)(2) of the Bankruptcy Code provides that "any fees and charges assessed against the estate under [section 1930 of] chapter 123 of title 28" are afforded priority as administrative expenses.

114.     The Plan satisfies section 1129(a)(12) of the Bankruptcy Code because Article XIII.C of the Plan expressly requires payment of Quarterly Fees due and payable pursuant to section 1930 of Title 28 of the Judicial Code before the Effective Date shall be paid by the Debtors.  After the Effective Date, to the extent applicable, the Liquidating Trust, or any entity making disbursements on behalf of any Debtor or the Liquidating Trust, or making disbursements on account of an obligation of any Debtor or the Liquidating Trust, shall be liable to pay any and all Quarterly Fees when due and payable and shall file with the Bankruptcy Court UST Form 11-PCR reports when they become due.[141]  Accordingly, the Plan complies with and satisfies the requirements of section 1129(a)(12) of the Bankruptcy Code.  No party has asserted otherwise.

**M.      Sections 1129(a)(13) through 1129(a)(16) of the Bankruptcy Code Do Not Apply to the Plan.**

115.     Section 1129(a)(13) of the Bankruptcy Code requires that all retiree benefits continue post-confirmation at any levels established in accordance with section 1114 of the Bankruptcy Code.  The Debtors do not have any remaining obligations to pay retiree benefits (as defined in section 1114 of the Bankruptcy Code).  Therefore, section 1129(a)(13) of the Bankruptcy Code is inapplicable to these Chapter 11 Cases or the Plan.  Section 1129(a)(14) of the Bankruptcy Code relates to the payment of domestic support obligations.  Since the Debtors are not subject to any domestic support obligations, the requirements of section 1129(a)(14) of the Bankruptcy Code do not apply.  Likewise, section 1129(a)(15) of the Bankruptcy Code applies only in cases in which the debtor is an "individual" as defined in the Bankruptcy Code.  Because none of the Debtors is an "individual," the requirements of section 1129(a)(15) of the Bankruptcy Code do not apply.  Finally, each of the Debtors are a moneyed, business, or commercial

---

[141]     *See* Plan, Art. XIII.C.

corporation and, therefore, section 1129(a)(16) of the Bankruptcy Code, which provides that property transfers by a corporation or trust that is not a moneyed, business, or commercial corporation or trust be made in accordance with any applicable provisions of nonbankruptcy law, is not applicable to these Chapter 11 Cases.

> **N.** **The Plan Satisfies the "Cram Down" Requirements of Section 1129(b) of the Bankruptcy Code.**

116.    Section 1129(b)(1) of the Bankruptcy Code provides that, if all applicable requirements of section 1129(a) of the Bankruptcy Code are met other than section 1129(a)(8) of the Bankruptcy Code, a plan may be confirmed so long as the requirements set forth in section 1129(b) of the Bankruptcy Code are satisfied.  To confirm a plan that has not been accepted by all impaired classes (thereby failing to satisfy section 1129(a)(8) of the Bankruptcy Code), the plan proponent must show that the plan does not "discriminate unfairly" and is "fair and equitable" with respect to the non-accepting impaired classes.[142]

117.    As noted above, notwithstanding the fact that Classes 6, 7, 8, and 9 are deemed to have rejected the Plan, the Plan is confirmable because it complies with sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.  No party has asserted otherwise.

> **1.** **The Plan Does Not Unfairly Discriminate with Respect to the Impaired Classes That Have Not Voted to Accept the Plan (§ 1129(b)(1)).**

118.    The Plan does not unfairly discriminate with respect to Classes 6, 7, 8, and 9. Although the Bankruptcy Code does not provide a standard for determining when "unfair discrimination" exists, courts typically examine the facts and circumstances of the particular case

---

[142]    *John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*, 987 F.2d 154, 157 n.5; *In re Ambanc La Mesa L.P.*, 115 F.3d 650, 653 (9th Cir. 1997) ("[T]he Plan satisfies the 'cramdown' alternative . . . found in 11 U.S.C. § 1129(b), which requires that the Plan 'does not discriminate unfairly' against and 'is fair and equitable' towards each impaired class that has not accepted the Plan.").

to make the determination.[143]   In general, courts have held that a plan unfairly discriminates in violation of section 1129(b) of the Bankruptcy Code only if it provides materially different treatment for creditors and interest holders with similar legal rights without compelling justifications for doing so.[144]   A threshold inquiry to assessing whether a proposed chapter 11 plan unfairly discriminates against a dissenting class is whether the dissenting class is equally situated to a class allegedly receiving more favorable treatment.[145]   Here, the Plan's treatment of the non-accepting Impaired Classes is proper because all similarly situated Holders of Claims and Interests at each applicable Debtor will receive substantially similar treatment, and the Plan's classification scheme rests on a legally acceptable rationale, including in relation to their differing legal nature and their respective rights against the Debtors.   Claims in each of the non-accepting

---

[143]   *In re Nuverra Env't Sols.*, 590 B.R. 75, 93 (D. Del. 2018), *aff'd on equitable mootness grounds*, 834 F. App'x 729 (3d Cir. 2021), *as amended* (Feb. 2, 2021) ("As unfair discrimination is not defined in the Bankruptcy Code, courts must examine the facts and circumstances of the particular case to determine whether unfair discrimination exists."); *In re Freymiller Trucking, Inc.*, 190 B.R. 913, 916 (Bankr. W.D. Okla. 1996) (holding that a determination of unfair discrimination requires a court to "consider all aspects of the case and the totality of all the circumstances"); *In re Aztec Co.*, 107 B.R. 585, 589 (Bankr. M.D. Tenn. 1989) ("Courts interpreting language elsewhere in the Code, similar in words and function to § 1129(b)(1), have recognized the need to consider the facts and circumstances of each case to give meaning to the proscription against unfair discrimination.").

[144]   *See In re Coram Healthcare Corp.*, 315 B.R. 321, 349 (Bankr. D. Del. 2004) (citing cases and noting that separate classification and treatment of claims is acceptable if the separate classification is justified because such claims are essential to a reorganized debtor's ongoing business); *In re Lernout & Hauspie Speech Prods., N.V.*, 301 B.R. 651, 661 (Bankr. D. Del. 2003) (permitting different treatment of two classes of similarly situated creditors upon a determination that the debtors showed a legitimate basis for such discrimination); *Ambanc La Mesa*, 115 F.3d at 656–57 (same); *Aztec Co.*, 107 B.R. at 589–91 (stating that plan which preserved assets for insiders at the expense of other creditors unfairly discriminated); *In re Johns-Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986) (stating that interests of objecting class were not similar or comparable to those of any other class and thus there was no unfair discrimination).

[145]   *See In re Aleris Int'l*, No. 09-10478, 2010 WL 3492664, at *31 (Bankr. D. Del. May 13, 2010) ("[S]ection 1129(b) of the Bankruptcy Code ensures that a plan does not unfairly discriminate against a dissenting class with respect to the value the dissenting class will receive under a plan when compared to the value given to all other similarly situated classes." (citation omitted)); *In re Armstrong World Indus.*, 348 B.R. 111, 122 (D. Del. 2006) ("A finding that all classes of the same priority will receive the identical amount under the proposed Plan is not necessary to find that the Plan does not discriminate. . . . [T]he presumption of unfair discrimination only arises if the dissenting class would receive a 'materially lower' percentage recovery or will have a 'materially greater risk' in connection with the distribution." (citation omitted)).

Impaired Classes are not similarly situated to those of any other Classes, given their distinctly different legal character from all other Claims and Interests.  Accordingly, the Plan does not discriminate unfairly with respect to Holders of Claims or Interests in Classes 6, 7, 8, or 9 who are deemed to reject the Plan and, therefore, satisfies the requirements of section 1129(b).

### 2.    The Plan Is Fair and Equitable (§ 1129(b)(2)).

119.    A plan is "fair and equitable" with respect to an impaired class of claims or interests that rejects a plan (or is deemed to reject a plan) if it follows the "absolute priority" rule.[146] This requires that an impaired rejecting class of claims or interests either be paid in full or that a class junior to the impaired accepting class not receive any distribution under a plan on account of its junior claim or interest.[147]

120.    Here, the Plan is "fair and equitable" to Holders of Claims and Interests in those Classes that were deemed to reject the Plan because the Plan satisfies the absolute priority rule with respect to each of these non-accepting Impaired Classes.  Specifically, no Holder of any junior Claim or Interest will receive or retain any property under the Plan on account of such junior Claim or Interest, except to the extent any Holder of a Claim or Interest has agreed to less favorable treatment with the Debtors and the Committee or as otherwise contemplated by the Liquidating Trust Agreement.[148]  With respect to Class 5 (General Unsecured Claims), if the Class receives any Distributable Proceeds on account of such Class 5 (General Unsecured Claims), such recovery will

---

[146]    *Bank of Am. Nat. Trust & Savs. Ass'n*, 526 U.S. at 441–42 ("As to a dissenting class of impaired unsecured creditors, such a plan may be found to be 'fair and equitable' only if the allowed value of the claim is to be paid in full, or, in the alternative, if 'the holder of any claim or interest that is junior to the claims of such [impaired unsecured] class will not receive or retain under the plan on account of such junior claim or interest any property[.]'  That latter condition is the core of what is known as the 'absolute priority rule.'" (citations omitted)).

[147]    *See id*.

[148]    *See* Whittman Declaration ¶ 28; 11 U.S.C. § 1129(b)(2).

only be after all senior Classes have been paid in full.  In light of this, the Plan structure is fair and equitable and does not violate the absolute priority rule.

121.    For the foregoing reasons, and further supported by the lack of objections on any grounds related to Section 1129(b)(2), the Plan can be crammed down on the non-consenting Impaired Classes.

### O.    The Plan Complies with the Remaining Provisions of Section 1129 of the Bankruptcy Code (Sections 1129(c)–(e)).

122.    The Plan satisfies the remaining provisions of section 1129 of the Bankruptcy Code.  ***First***, section 1129(c) of the Bankruptcy Code, which prohibits confirmation of multiple plans, is not implicated because there is only one proposed plan.  ***Second***, the purpose of the Plan is not to avoid taxes or the application of section 5 of the Securities Act of 1933.[149]  Moreover, no governmental unit or any other party has requested that the Bankruptcy Court decline to confirm the Plan on such grounds.  As provided in the Whittman Declaration, the Plan is the product of extensive, good-faith, arm's-length negotiations among the Debtors, the Committee, and other of the Debtors' stakeholders and is designed to maximize value and bring these Chapter 11 Cases to an orderly, efficient conclusion in accordance with the distribution priorities set forth in the Plan and consistent with the Bankruptcy Code.[150]  Accordingly, the Plan satisfies the requirements of section 1129(d) of the Bankruptcy Code.  ***Lastly***, section 1129(e) of the Bankruptcy Code is inapplicable because none of the Debtors' Chapter 11 Cases are a "small business case."[151]

---

[149]    *See* 15 U.S.C. § 77e.

[150]    *See* Whittman Declaration, ¶ 22.

[151]    *See* 11 U.S.C. § 1129(e).  A "small business debtor" cannot be a member "of a group of affiliated debtors that has aggregate noncontingent liquidated secured and unsecured debts in an amount greater than $3,424,000 [] (excluding debt owed to 1 or more affiliates or insiders)."  11 U.S.C. § 101(51D)(B).

Accordingly, the Plan satisfies the requirements of section 1129(c), (d), and (e) of the Bankruptcy Code.  No party has asserted otherwise.

### III.   The Discretionary Contents of the Plan Are Appropriate Under Section 1123(b) of the Bankruptcy Code.

123.    Section 1123(b) of the Bankruptcy Code sets forth various discretionary provisions that may be incorporated into a chapter 11 plan.  Among other things, section 1123(b) of the Bankruptcy Code provides that a plan may:  (a) impair or leave unimpaired any class of claims or interests; (b) modify or leave unaffected the rights of holders of secured or unsecured claims; (c) provide for the settlement or adjustment of claims against or interests in a debtor or its estate or the retention and enforcement by a debtor, trustee, or other representative of claims or interests; (d) provide for the assumption or rejection of executory contracts and unexpired leases; (e) provide for the sale of all or substantially all of the property of the debtors' estates, and the distribution of the proceeds of such sale among holders of claims or interests; or (f) include any other appropriate provision not inconsistent with the applicable provisions of the Bankruptcy Code.[152]

124.    As set forth below, the Plan includes certain of these discretionary provisions, such as releases and general settlement of Claims and Interests.  The Debtors have determined, as fiduciaries of their Estates and in the exercise of their reasonable business judgment, that each of the discretionary provisions of the Plan is appropriate given the circumstances of these Chapter 11 Cases.

125.    Here, the Plan includes various discretionary provisions that are consistent with the discretionary authority vested under section 1123(b) of the Bankruptcy Code.  For example, the Plan impairs certain Classes of Claims and Interests and leaves others Unimpaired, proposes

---

[152]   *See* 11 U.S.C. § 1123(b)(1)–(6).

treatment for Executory Contracts and Unexpired Leases, provides a structure for Claim allowance and disallowance, and establishes a distribution process for the satisfaction of Allowed Claims entitled to distributions under the Plan.  In addition, the Plan contains provisions implementing certain releases and exculpations, and permanently enjoining certain causes of action.

126.     Each of these provisions are appropriate because, among other things, they (a) are the product of arm's-length negotiations, (b) have been critical to obtaining the support of the various constituencies for the Plan, (c) are given for valuable consideration, (d) are fair and equitable and in the best interests of the Debtors, these Estates, and the Chapter 11 Cases, and (e) are consistent with the relevant provisions of the Bankruptcy Code and Third Circuit law.  Such provisions are discussed in turn below but, in summary, satisfy the requirements of section 1123(b).

**A.     The Plan's Release, Exculpation, and Injunction Provisions Satisfy Section 1123(b) of the Bankruptcy Code.**

127.     The Plan also includes certain Debtor and third-party releases, an exculpation provision, and an injunction provision.  These discretionary provisions are proper because, among other things, they are the product of extensive good-faith, arm's-length negotiations, are overwhelmingly supported by the Committee, the Debtors, and their key stakeholders, and are consistent with applicable precedent.  Further, these provisions were fully and conspicuously disclosed to all parties in interest through the Confirmation Hearing Notice, the Ballots, and the applicable Notices of Non-Voting Status and Opt-In Forms, each of which excerpted the full text of the releases, exculpation, and injunction provision as set forth in the Plan.

**1.     The Debtor Release Is Appropriate.**

128.     Section 1123(b)(3)(A) of the Bankruptcy Code provides that a chapter 11 plan may provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the

estate."[153]    Furthermore, a debtor may release claims under section 1123(b)(3)(A) of the Bankruptcy Code "if the release is a valid exercise of the debtor's business judgment, is fair, reasonable, and in the best interests of the estate."[154]

129.    In determining whether a debtor release is proper, courts in the Third Circuit generally may consider the following five factors:

      a.    whether there is an identity of interest between the debtor and the third party;

      b.    whether the non-debtor has made a substantial contribution to the debtor's reorganization;

      c.    whether the release is essential to the debtor's reorganization;

      d.    whether there is an agreement by a substantial majority of creditors to support the release; and

      e.    whether a plan provides for payment of all or substantially all of the claims in the class or classes affected by the release.[155]

Not all of the above factors need to be satisfied for a court to approve a debtor release.[156]

---

[153]    11 U.S.C. § 1123(b)(3)(A); *see also Coram*, 315 B.R. at 334–35 ("The standards for approval of a settlement under section 1123 [of the Bankruptcy Code] are generally the same as those under [Bankruptcy] Rule 9019."). Generally, courts in the Third Circuit approve a settlement by the debtors if the settlement "exceed[s] the lowest point in the range of reasonableness." *Id.* at 334 (internal citations omitted); *e.g., In re Exaeris, Inc.*, 380 B.R. 741, 746 (Bankr. D. Del. 2008); *In re World Health Alts., Inc.*, 344 B.R. 291, 296 (Bankr. D. Del. 2006) (stating that settlement must be "within the reasonable range of litigation possibilities" (internal quotation marks omitted)).

[154]    *In re Spansion, Inc.*, 426 B.R. 114, 143 (Bankr. D. Del. 2010); *see also In re Wash. Mut., Inc.*, 442 B.R. 314, 327 (Bankr. D. Del. 2011) ("In making its evaluation [whether to approve a settlement], the court must determine whether 'the compromise is fair, reasonable, and in the best interest of the estate.'"); *accord In re WCI Cable, Inc.*, 282 B.R. 457, 469 (Bankr. D. Or. 2002) ("A debtor-in-possession has the burden of proof by a preponderance of the evidence to establish that a proposed settlement is reasonable, adequate, fair and equitable.").

[155]    *See, e.g., In re Zenith Elecs. Corp.*, 241 B.R. 92, 110 (Bankr. D. Del. 1999) (citing *In re Master Mortg. Inv. Fund, Inc.*, 168 B.R. 930, 935 (Bankr. W.D. Mo. 1994)); *In re Spansion, Inc.*, 426 B.R. at 143 n.47 (citing the *Zenith* factors).

[156]    *See, e.g., In re Wash. Mut.*, 442 B.R. at 346 ("These factors are neither exclusive nor conjunctive requirements, but simply provide guidance in the [c]ourt's determination of fairness.") (internal citation omitted); *In re Exide Techs.*, 303 B.R. 48, 72 (Bankr. D. Del. 2003) (finding that Zenith factors are not exclusive or conjunctive requirements).

130.    Article IX.B of the Plan provides for releases by each and all of the Debtors, their Estates, and the Liquidating Trustee of any and all Claims and Causes of Action, including any derivative claims, that the Debtors, their Estates or affiliates, or the Liquidating Trustee could assert against each of the Released Parties (the "Debtor Release").[157]  The scope of the Debtor Release is tailored to exclude any Claims or Causes of Action arising out of, or related to, any act or omission of a Released Party that is determined by a Final Order by a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence.[158]  The Debtor Release meets the applicable business judgement standard because it is fair, reasonable, in the best interests of the Debtors' Estates, the product of extensive arm's-length negotiations, and was critical to obtaining support for the Plan.[159]  Indeed, the Debtor Release is an indispensable component to achieve final resolution of potential disputes that would otherwise negatively affect these Chapter 11 Cases and the available recoveries under the Plan.[160]  Moreover, the scope of the Debtor Release is consistent with those regularly approved in this district.[161]

---

[157]    The Released Parties include: (a) the Debtors; (b) the Liquidating Trustee, (c) all Holders of Claims; (d) all Holders of Interests; (e) the Committee and its current and former members (including any ex-officio member(s)); (f) each Releasing Party; (g) the Information Officer; (h) each current and former Affiliate of each Entity in clause (a) through the following clause (i); and (i) each Related Party of each Entity in clause (a) through clause (i); *provided* that in each case, an Entity shall not be a Released Party if it elects not to opt into the releases described in Article IX of this Plan.

[158]    *See* Plan, Art. IX.B; *see also* Whittman Declaration, ¶ 30.

[159]    *See* Whittman Declaration, ¶¶ 32-33.

[160]    *See* Whittman Declaration, ¶ 30.

[161]    *See In re Oldco Tire Distribs., Inc.*, No. 24-12391 (CTG) (Bankr. D. Del. Mar. 28, 2025) (confirming a chapter 11 plan including a similar scope of debtor releases); *In re EXP OldCo Winddown, Inc.*, No. 24-110831 (KBO) (Bankr. D. Del. Dec. 17, 2024) (same); *In re Vyaire Med., Inc.*, No. 24-11217 (BLS) (Bankr. D. Del. Nov. 14, 2024) (same); *In re SunPower Corp.*, No. 24-11649 (CTG) (Bankr. D. Del. Oct. 18, 2024) (same); *In re Wheel Pros, LLC*, No. 24-11939 (JTD) (Bankr. D. Del. Oct. 15, 2024) (same).

131.    The Debtor Release satisfies the *Zenith* factors.   ***First***, each Released Party has made a substantial and valuable contribution to the Debtors' Estates.[162]   Delaware bankruptcy courts have recognized that a wide variety of acts may illustrate a substantial contribution to a debtor's estate.[163]   During the course of these chapter 11 cases, the Released Parties played an integral role in maximizing value for the Debtors and their stakeholders, including by contributing significant time and resources analyzing and negotiating the terms of the Plan, Third-Party Sale Transactions, the Liquidation Transactions, all of which will maximize the value of the Debtors' Estates for the benefit of all parties in interest.[164]   These measures, among others, provided the Debtors with access to the liquidity necessary to commence, and operate during, these Chapter 11 Cases, enabled the Debtors to consummate numerous value-maximizing Sale Transactions, and have allowed the Debtors to chart a path toward an orderly and cost-efficient wind-down on the terms set forth in the Plan.[165]   In short, without the contributions of each of the Released Parties, the Plan and the transactions contemplated thereby, would not have been possible.[166]   Therefore, the non-Debtors have made substantial contributions to the Debtors' reorganization.

---

[162]    *See* Whittman Declaration, ¶ 31.

[163]    *See In re Indianapolis Downs. LLC*, 486 B.R. 286, 304 (Bankr. D. Del. 2013) (finding that the non-debtor party had substantially contributed by performing services for the debtors post-petition without receiving compensation); *In re Wash. Mut., Inc.*, 442 B.R. at 348 (finding substantial contribution required the contribution of "cash or anything else of a tangible value to the [chapter 11 plan] or to creditors"); *In re Zenith Elecs. Corp.*, 241 B.R. at 111 (finding that directors' and officers' prepetition contribution of work in negotiating a plan constituted adequate consideration for debtor's release).

[164]    *See* Whittman Declaration, ¶ 31.

[165]    *Id.*

[166]    *Id.*

132.    **_Second_**, the Debtor Release is essential to the success of the Debtors' Plan successful resolution of the Chapter 11 Cases because it constitutes an integral term of the Plan.[167] Indeed, absent the Debtor Release, the Debtors may not have been able to build the level of consensus with respect to the Plan and the transactions contemplated thereby.[168]  Importantly, the Debtor Release is the product of arm's-length and good-faith negotiations between the Debtors and their key stakeholders and is appropriately limited in scope.[169]  The Debtor Release does not release any entity other than the Released Parties, their respective Affiliates, and each of their Related Parties (to the extent such Related Parties would be obligated to grant a release under principles of agency if they were so directed by the Releasing Parties to which they are related), as applicable, and does not release the Claims and Causes of Action expressly set forth and preserved by the Plan.[170]  Furthermore, the scope of the Debtor Release is tailored to exclude any Claims or Causes of Action arising out of, or related to, any act or omission of a Released Party that is determined by a Final Order by a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence.[171]  In consideration for the Debtor Release, the Debtors, their Estates, and the Liquidating Trustee will receive mutual releases from potential Claims and Causes of Action of each of the Releasing Parties.[172]  Absent the Debtor Release, the

---

[167]    _See_ Whittman Declaration, ¶ 32.

[168]    _Id._

[169]    _Id._

[170]    _See_ Plan, Art. IV.N.

[171]    _See_ Plan, Art. IX.B; _see also_ Whittman Declaration, ¶ 30.

[172]    _See_ Plan, Art. IX.C.

Debtors may not have been able to build the level of consensus with respect to the Plan and the transactions contemplated thereby.[173]  Therefore, the inclusion of the Debtor Release is integral to the Plan's success, is worthwhile, and inures to the benefit of the Debtors' stakeholders.

133.    Moreover, the Debtor Release is necessary for the finality contemplated by the Plan.  Without the Debtor Release contemplated in the Plan, stakeholders may continue to litigate over the Estates, which would cause related wind-down issues and additional expenses.  The Debtor Release provides finality, facilitates the consummation of the Plan, and charts a path toward an orderly and cost-efficient wind-down on the terms set forth in the Plan.[174]  In the absence of the aforementioned parties' contributions, the Liquidation Transactions contemplated by the Plan would be significantly more challenging to effectuate.  The Debtor Release, therefore, is key to the successful implementation of the Plan and, in turn, resolution of these Chapter 11 Cases, for the benefit of all stakeholders.

134.    **Third**, as evidenced by the Voting Report and noted therein, the Debtors' stakeholders overwhelmingly support the Plan, including the Debtor Release, and no stakeholder has objected to the Debtor Release contained in the Plan.  The Voting Class voted to accept the Plan.[175]  This degree of consensus evidences the Debtors' stakeholders' support for the Debtor Release and Plan.

135.    **Fourth**, the Plan maximizes the value of the Debtors' assets and the distribution of available proceeds to creditors.  The Plan provides for meaningful recoveries for creditors in

---

[173]    *See* Whittman Declaration, ¶ 32.

[174]    *See* Whittman Declaration, ¶ 30.

[175]    *See* Voting Report, Exhibit A.

exchange for, among other things, the Debtors' Release of potential claims, and the Plan has been carefully crafted to maximize value and provides meaningful recoveries for all stakeholders under the circumstances.

136.     For the reasons set forth above, and as supported by the Whittman Declaration, the Zenith factors support approval of the Debtor Release, and the Debtors have satisfied the business judgment standard in granting the Debtor Release under the Plan.  Thus, the Bankruptcy Court should approve the Debtor Release in the Plan.

## 2.     The Consensual Third-Party Release Is Appropriate.

137.     In addition to the Debtor Release, the Plan provides for mutual releases by certain Holders of Claims and Interests.   Specifically, Article IX.C of the Plan provides that each Releasing Party shall release any and all Claims and Causes of Action such parties could assert against the Debtors, the Liquidating Trust, the Estates, and the other Released Parties (the "<u>Third-Party Release</u>" and, together with the Debtor Release, the "<u>Releases</u>"), with certain limited exceptions.  The Releasing Parties include, each of, and in each case in its capacity as such: (a) the Debtors; (b) the Liquidating Trustee; (c) all Holders of Claims who vote to accept the Plan *and who affirmatively opt in to the releases provided by the Plan*; (d) all Holders of Claims who vote to reject the Plan *and who affirmatively opt in to the releases provided by the Plan*; (e) all Holders of Claims who are deemed to reject the Plan *and who affirmatively opt in to the releases provided by the Plan*; (f) all Holders of Claims who are presumed to accept the Plan *and who affirmatively opt in to the releases provided by the Plan*; (g) all Holders of Interests *who affirmatively opt in to the releases provided by the Plan*; (h) the Committee and its members (including any *ex officio* member(s)); (i) each current and former Affiliate of each Entity in clause (a) through the following clause (j) for which such Entity is legally entitled to bind such Affiliate to the releases contained in the Plan under applicable non-bankruptcy law; and (j) each Related

Party of each Entity in clause (a) through clause (i) for which such Affiliate or Entity is legally entitled to bind such Related Party to the releases contained in the Plan under applicable non-bankruptcy law; *provided* that each such Entity that elects not to opt into the releases contained in the Plan, such that it is not a Releasing Party in its capacity as a Holder of a Claim or Interest shall nevertheless be a Releasing Party in each other capacity applicable to such Entity. The Third-Party Release is consensual, consistent with established Third Circuit law, and integral to the Plan. The Third-Party Release should therefore be approved.

138.    Courts in this jurisdiction routinely approve such release provisions if, as here, they are consensual and appropriately tailored. Consensual releases are permissible on the basis of general principles of contract law.[176] Courts have also held that an affirmative agreement from an affected creditor will render a release consensual.[177] The law is clear that a release is consensual where parties have received sufficient notice and have had an opportunity to object to and/or opt in to the releases. In *Emerge*, this Court recognized that a release by a non-debtor third party is consensual where the releasing party indicates its consent by an affirmative act.[178] Since *Emerge*,

---

[176]    *See In re Smallhold, Inc.*, 665 B.R. 704, 722–23 (Bankr. D. Del. 2024) (following the "contract model" of evaluating third-party releases); *In re Coram Healthcare Corp.*, 315 B.R. at 336 ("[A] [p]lan is a contract that may bind those who vote in favor of it.").

[177]    *See id.* ("[T]o the extent creditors or shareholders voted in favor of [a plan providing for the release of their claims] they are bound by that [plan]."); *In re W. Coast Video Enters., Inc.*, 174 B.R. 906, 911 (Bankr. E.D. Pa. 1994) ("[E]ach creditor bound by the terms of the [non-debtor] release must individually affirm same, either with a vote in favor of a plan including such a provision, or otherwise.").

[178]    *Compare In re Emerge Energy Servs. LP*, No. 19-11563 (KBO), (Bankr. D. Del. Dec. 5, 2019) (declining to approve third-party release where holders of claims and interests were presumed to consent to participation in the third-party release if they did not return an opt-out form, regardless of whether such holder returned a ballot); *with*, *e.g.*, *In re AeroCision Parent, LLC*, No. 23-11032 (KBO) (Bankr. D. Del. Mar. 4, 2024) (approving a consensual third-party release that included, among others, all holders of claims who return a ballot voting to accept the plan, with no option to opt out); *In re Virgin Orbit*, No. 23-10405 (KBO) (Bankr. D. Del. July 31, 2023) (same); *In re Lucky Bucks,* No. 23-10758 (KBO) (Bankr. D. Del. July 28, 2023) (same, also including all holders of claims who return a ballot voting to reject plan who do not opt out).

this Court and others have approved numerous third-party releases as consensual where the releasing third parties were required to indicate their consent by returning a form indicating the party's desire to participate in the third-party release.[179]

139.     Furthermore, the Supreme Court's decision in *Purdue* is not at odds with the release provisions commonly approved by this Court, and its holding is generally inapplicable to the release provisions contemplated by the Debtors.  In *Purdue*, the Supreme Court made clear the narrow scope of the decision by pointing out that "nothing in [this opinion] should be construed to call into question *consensual* third-party releases offered in connection with a bankruptcy reorganization plan."[180]   Therefore, *Purdue*'s applicability is limited to cases where a debtor or debtors seek non-consensual third-party releases.

140.     Approval of the Third-Party Release under the circumstances of these Chapter 11 Cases is appropriate because it is not binding on any non-consenting parties.  Here, all parties in interest were provided extensive notice of these Chapter 11 Cases, the Plan, and the deadline to object to confirmation of the Plan.  Moreover, the Disclosure Statement, the Confirmation Hearing Notice, the Ballots, and the Notices of Non-Voting Status and Opt-In Forms provided recipients with timely, sufficient, appropriate, and adequate notice of the Third-Party Release.  The Debtors required all Holders of Claims or Interests to affirmatively opt in to the Third-Party Release by either checking a box on the Ballot and returning the Ballot, or by completing and returning the applicable Opt-In Form, and provided each Holder of a Claim or Interest with ample notice and

---

[179]     *See In re JOANN Inc.*, No. 25-10068 (CTG) (Bankr. D. Del. July 10, 2025) (confirming a chapter 11 plan including opt-in third-party releases); *In re Tupperware Brands Corp.*, No. 24-12156 (BLS) (Bankr. D. Del. May 9, 2025) (same); *In re Oldco Tire Distribs., Inc.*, No. 24-12391 (CTG) (Bankr. D. Del. Mar. 28, 2025) (same); *In re Accuride Corp.*, No. 24-12289 (JKS) (Bankr. D. Del. Mar. 6, 2025) (same); *In re EXP OldCo Winddown, Inc.*, No. 24-110831 (KBO) (Bankr. D. Del. Dec. 17, 2024) (same).

[180]     *Harrington v. Purdue Pharma L. P.*, 603 U.S. 204, 226 (2024) (emphasis added).

instructions on how to do so.  As of the Voting Deadline, 317 parties have affirmatively opted into the Third-Party Release by completing and returning a Ballot with the applicable box checked, or by completing and returning the applicable Notice of Non-Voting Status and Opt-In Form.[181]

141.    For all these reasons, the inclusion of Holders of Claims against or Interests in the Debtors who affirmatively opt in to the releases provided by the Plan as "Releasing Parties" under the Plan and with respect to the Third-Party Release is appropriate and should be approved. Importantly, the Confirmation Hearing Notice, the Notices of Non-Voting Status and Opt-In Forms, and the Ballots, as applicable, quoted the entirety of the Third-Party Release in bold, conspicuous font, and clearly provided such Holders with detailed instructions on how to opt in to the Third-Party Release.  Thus, affected parties were on notice of the Third-Party Release, including the option to opt in to the Third-Party Release.  All Holders of Claims and Interests also had the opportunity to object to the Third-Party Release by timely filing an objection to the Plan. The Third-Party Release is therefore consensual as to all creditors and interest holders who affirmatively opted in to the Third-Party Release.

142.    The Third-Party Release brought key stakeholders to the table for negotiations around the Sale Transaction and the Plan, each of which contributed to the Debtors' success in these Chapter 11 Cases.  As noted in the Whittman Declaration, the Third-Party Release was and is necessary to secure support for the Plan from the Committee and other stakeholders.[182]  And importantly, the Third-Party Release only applies to parties who have (a) actively participated in the chapter 11 or Plan process, including in the formulation and negotiation of the Third-Party

---

[181]    Certain parties submitted Opt-In Forms after the Voting Deadline that were accepted by the Debtors based on a consensual extension of the applicable deadline for such parties.

[182]    *See* Whittman Declaration, ¶ 35.

Release or (b) manifested their affirmative consent to the Third-Party Release.    Thus, the Third-Party Release is wholly consensual.

143.    The Debtors submit that the inclusion of "Affiliates" and "Related Parties" as "Releasing Parties" is also appropriate, even though those parties have not necessarily manifested consent to the Third-Party Release.[183]  Courts in this district regularly approve such provisions, so long as the Plan specifies that such entities are "Releasing Parties" solely to the extent they can be bound under principles of applicable agency law by the "Releasing Party" to which they are related, so that a hypothetical future court may intelligibly interpret the Plan to determine if a party was released or not.[184]    Here, the Plan provides that "Affiliates" and "Related Parties" are "Releasing Parties" to the extent that such Entity "is legally entitled to bind such Related Party to the releases contained in the Plan under applicable non-bankruptcy law."[185] Therefore, the inclusion of "Affiliates" and "Related Parties" in the Third-Party Release should be approved.

144.    For the foregoing reasons, the Third-Party Release is consensual, permissible, and an integral and necessary part of the Plan.    Accordingly, the Third-Party Release should be approved.

### 3.    The Exculpation Provisions Are Appropriate.

145.    Exculpation provisions that apply only to estate fiduciaries and are limited to claims not involving actual fraud, willful misconduct, or gross negligence, are customary and generally

---

[183]    *See* Plan, Art. I.A.125.

[184]    *See In re JOANN Inc.*, No. 25-10068 (CTG) (Bankr. D. Del. July 10, 2025) (confirming a chapter 11 plan including opt-in third-party releases); *In re Tupperware Brands Corp.*, No. 24-12156 (BLS) (Bankr. D. Del. May 9, 2025) (same); *In re Oldco Tire Distribs., Inc.*, No. 24-12391 (CTG) (Bankr. D. Del. Mar. 28, 2025) (same); *In re Accuride Corp.*, No. 24-12289 (JKS) (Bankr. D. Del. Mar. 6, 2025) (same); *In re EXP OldCo Winddown, Inc.*, No. 24-110831 (KBO) (Bankr. D. Del. Dec. 17, 2024) (same).

[185]    Plan, Art. I.A.121.

approved in this district under appropriate circumstances.[186]   Unlike third-party releases, exculpation provisions do not affect the liability of third parties per se, but rather set a standard of care of gross negligence or willful misconduct in future litigation by a non-releasing party against an "Exculpated Party" for acts arising out of the Debtors' restructuring.[187]

146.     Article IX.D of the Plan provides for the exculpation of the Exculpated Parties.[188] The exculpation is fair and appropriate under both applicable law and the facts and circumstances of these Chapter 11 Cases.[189]   The Plan's exculpation provision is the product of arm's-length negotiations, was critical to obtaining the support of various constituencies for the Plan, and, as part of the Plan, has received support from the Debtors' major stakeholders.[190]   The exculpation provision was important to the development of a feasible, confirmable Plan, and the Exculpated

---

[186]   *See In re JOANN Inc.*, No. 25-10068 (CTG) (Bankr. D. Del. July 10, 2025) (confirming a chapter 11 plan including an exculpation provision); *In re Tupperware Brands Corp.*, No. 24-12156 (BLS) (Bankr. D. Del. May 9, 2025) (same); *In re Oldco Tire Distribs., Inc.*, No. 24-12391 (CTG) (Bankr. D. Del. Mar. 28, 2025) (same); *In re Accuride Corp.*, No. 24-12289 (JKS) (Bankr. D. Del. Mar. 6, 2025) (same); *In re EXP OldCo Winddown, Inc.*, No. 24-110831 (KBO) (Bankr. D. Del. Dec. 17, 2024) (same).

[187]   *See In re PWS Holding Corp.*, 228 F.3d 224, 245 (3d Cir. 2000) (finding that an exculpation provision "is apparently a commonplace provision in Chapter 11 plans, [and] does not affect the liability of these parties, but rather states the standard of liability under the Code"); *see also In re Premier Int'l Holdings, Inc.*, No. 09-12019, 2010 WL 2745964, at *10 (Bankr. D. Del. Apr. 29, 2010) (approving a similar exculpation provision as that provided for under the Plan); *In re Spansion*, No. 09-10690, 2010 WL 2905001, at *16 (Bankr. D. Del. 2010) (same).

[188]   Article I.A.67 of the Plan defines "Exculpated Parties" as, collectively, and in each case solely in its capacity as such: (a) each of the Debtors and their current and former directors, managers, and officers that served in such capacity between the Petition Date and Effective Date; (b) the Committee and each of its current and former members (including any *ex-officio* member(s)); and (c) the Professionals retained by the Debtors and Committee.

[189]   *See In re Lab'y Partners, Inc.*, No. 13-12769 (PJW) (Bankr. D. Del. July 10, 2014) (finding that exculpation was appropriately extended to secured lender who funded the chapter 11 case); *In re FAH Liquidating Corp.*, No. 13-13087 (KG) (Bankr. D. Del. July 28, 2014) (finding that exculpation as applied to a non-debtor purchaser was appropriate under section 1123(b)).

[190]   *See* Whittman Declaration ¶ 37.

Parties participated in these Chapter 11 Cases in reliance upon the protections afforded to those constituents by the exculpation.[191]

147.    Moreover, the exculpation provision and the liability standard it sets represents a conclusion of law that flows logically from certain findings of fact that the Bankruptcy Court must reach in confirming the Plan as it relates to the Debtors.  As discussed above, the Bankruptcy Court must find, under section 1129(a)(2) of the Bankruptcy Code, that the Debtors have complied with the applicable provisions of the Bankruptcy Code.  Additionally, the Bankruptcy Court must find, under section 1129(a)(3) of the Bankruptcy Code, that the Plan has been proposed in good faith and not by any means forbidden by law.  These findings apply to the Debtors and, by extension, to certain of the Debtors' officers, directors, employees, and professionals.  Furthermore, these findings imply that the Plan was negotiated at arm's-length and in good faith.  Where such findings are made, parties who have been actively involved in such negotiations should be protected from collateral attack.

148.    Here, the Debtors and their officers, directors, and professionals actively negotiated with Holders of Claims and Interests as part of the Plan and these Chapter 11 Cases.  Such negotiations were extensive, and the resulting agreements were implemented in good faith with a high degree of transparency.[192]  As a result, the Plan enjoys significant support from Holders of Claims entitled to vote and the Committee.[193]  Accordingly, the Bankruptcy Court's findings of good faith vis-à-vis the Debtors' Chapter 11 Cases should also extend to the Exculpated Parties.

---

[191]    *Id.*

[192]    *See* Whittman Declaration ¶ 38.

[193]    *See, e.g.*, Voting Report, <u>Exhibit A</u>.

149.     In addition, the promise of exculpation played a significant role in facilitating Plan negotiations.[194]  All of the Exculpated Parties played a key role in negotiating, formulating, and implementing the Sale Transactions, the Disclosure Statement, the Plan, and related documents in furtherance thereof, which paved the way for a remarkable value-maximizing resolution of these Chapter 11 Cases.  The Exculpated Parties may not have been inclined to participate in the plan process without the promise of exculpation.  Exculpation for parties participating in the plan process is appropriate where plan negotiations could not have occurred without protection from liability.[195]  Accordingly, under the circumstances, it is appropriate for the Court to approve the exculpation provision and to find that the Exculpated Parties have acted in good faith and in compliance with the law.[196]

### 4.     The Injunction Provision Is Appropriate.

150.     The injunction provision set forth in Article IX.E of the Plan (the "Plan Injunction") merely implements the Plan's release and exculpation provisions, in part, by permanently enjoining all entities from commencing or maintaining any action against the Debtors, the Liquidating Trust, the Exculpated Parties, or the Released Parties on account of or in connection with or with respect to any such claims or interests released or subject to exculpation pursuant to the Plan.  Thus, the injunction provision is a key provision of the Plan because it enforces the release and exculpation provisions in the Plan.  Moreover, the Plan Injunction is narrowly tailored to achieve its purpose and consensual as to any party that did not specifically object to it.  As such,

---

[194]   *See* Whittman Declaration ¶ 39.

[195]   *See In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285, 293 (2d Cir. 1992); *In re Enron Corp.*, 326 B.R. 497, 503 (S.D.N.Y. 2005) (excising similar exculpation provisions would "tend to unravel the entire fabric of the Plan, and would be inequitable to all those who participated in good faith to bring it into fruition").

[196]   *See In re PWS Holding Corp.*, 228 F.3d 224 at 246–47 (approving plan exculpation provision exception for willful misconduct and gross negligence); *In re Indianapolis Downs*, 486 B.R. at 306 (same).

to the extent the Bankruptcy Court finds that the exculpation and release provisions are appropriate, the Debtors respectfully submit that the Plan Injunction must also be appropriate.  No party has asserted otherwise.

**B.      The Plan Complies with Section 1123(d) of the Bankruptcy Code.**

151.      Section 1123(d) of the Bankruptcy Code provides that "if it is proposed in a plan to cure a default the amount necessary to cure the default shall be determined in accordance with the underlying agreement and nonbankruptcy law."[197]

152.      Article V.C of the Plan provides for the satisfaction of all monetary defaults under each Executory Contract and Unexpired Lease assumed pursuant to the Plan in accordance with section 365 of the Bankruptcy Code by payment of the default amount in Cash on the Effective Date, or as soon as reasonably practicable thereafter, subject to certain limitations set forth in the Plan, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.[198]  The Debtors, in accordance with the Disclosure Statement Order and the Plan, filed the Plan Supplement with the Assumed Executory Contracts and Unexpired Leases Schedule.[199]  The Debtors will cure any monetary defaults in any of the Assumed Executory Contracts and Unexpired Leases on the Effective Date, subject to the restrictions set forth in Plan Article V.C.  Accordingly, the Debtors submit that the Plan fully complies with section 1123(d) of the Bankruptcy Code. No party has asserted otherwise.

---

[197]    11 U.S.C. § 1123(d).

[198]    Plan, Art. V.C.

[199]    *See* Second Amended Plan Supplement*; see also* Plan, Art. V.

## C.      Modifications to the Plan.

153.      Section 1127(a) of the Bankruptcy Code provides that a plan proponent may modify its plan at any time before confirmation as long as such modified plan meets the requirements of sections 1122 and 1123 of the Bankruptcy Code.  Further, when the proponent of a plan files the plan with modifications with the court, the plan as modified becomes the plan.  Bankruptcy Rule 3019 provides that modifications after a plan has been accepted will be deemed accepted by all creditors and equity security holders who have previously accepted the plan if the court finds that the proposed modifications do not adversely change the treatment of the claim of any creditor or the interest of any equity security holder.  Interpreting Bankruptcy Rule 3019, courts consistently have held that a proposed modification to a previously accepted plan will be deemed accepted where the proposed modification is not material or does not adversely affect the way creditors and stakeholders are treated.[200]  As courts have recognized, "a plan modification is immaterial unless it will 'so affect a creditor or interest holder who accepted the plan that such entity, if it knew of the modification, would be likely to reconsider its acceptance.'"[201]

154.      Contemporaneously herewith, the Debtors filed the Plan, which makes technical clarifications and resolves certain formal objections and informal comments to the Plan by parties in interest.  The modifications are immaterial or do not adversely affect the way creditors and stakeholders who have previously accepted the Plan are treated and thus comply with section 1127

---

[200]    *See, e.g.*, *In re Glob. Safety Textiles Holdings LLC*, No. 09-12234, 2009 WL 6825278, at *4 (Bankr. D. Del. Nov. 30, 2009) (finding that nonmaterial modifications to plan do not require additional disclosure or resolicitation); *In re Burns & Roe Enters., Inc.*, No. 08-4191, 2009 WL 438694, at *23 (D.N.J. Feb. 23, 2009) (confirming plan as modified without additional solicitation or disclosure because modifications did "not adversely affect creditors").

[201]    *In re Boy Scouts of Am. & Del. BSA, LLC*, 650 B.R. 87, 168 (D. Del 2023) (quoting *In re Am. Solar King*, 90 B.R. 808, 824 (Bankr. W.D. Tex. 1988)).

of the Bankruptcy Code and Bankruptcy Rule 2019.  Accordingly, the Debtors submit that no additional solicitation or disclosure is required on account of the modifications, and that such modifications should be deemed accepted by all creditors that previously accepted the Plan.

155.    For all of the reasons set forth herein and in the Whittman Declaration and the Voting Report, and as will be further shown at the Confirmation Hearing, the Debtors respectfully request that the Bankruptcy Court approve the Disclosure Statement and confirm the Plan as fully satisfying all of the applicable requirements of the Bankruptcy Code by entering the Proposed Confirmation Order, overrule the remaining Objections, and grant such other and further relief as is just and proper.

[*Remainder of Page Intentionally Left Blank*]

Dated:  November 9, 2025
Wilmington, Delaware

*/s/ Peter J. Keane*
_____

| | |
|---|---|
| Laura Davis Jones (DE Bar No. 2436) | Patrick J. Nash Jr., P.C. (admitted *pro hac vice*) |
| Timothy P. Cairns (DE Bar No. 4228) | David Seligman, P.C. (admitted *pro hac vice*) |
| Peter J. Keane (DE Bar No. 5503) | Robert A. Jacobson (admitted *pro hac vice*) |
| Edward Corma (DE Bar No. 6718) | **KIRKLAND & ELLIS LLP** |
| **PACHULSKI STANG ZIEHL & JONES LLP** | **KIRKLAND & ELLIS INTERNATIONAL LLP** |

919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19801
Telephone:     (302) 652-4100
Facsimile:     (302) 652-4400
Email:         ljones@pszjlaw.com
               tcairns@pszjlaw.com

               pkeane@pszjlaw.com
               ecorma@pszjlaw.com

333 W Wolf Point Plaza
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200
Email:         patrick.nash@kirkland.com
               david.seligman@kirkland.com
               rob.jacobson@kirkland.com

-and-

Allyson B. Smith (admitted *pro hac vice*)
Aaron Metviner (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900
Email:         allyson.smith@kirkland.com
               aaron.metviner@kirkland.com

*Co-Counsel for the Debtors and Debtors in*
*Possession*

## Exhibit A

**Objection Resolution Chart**

## Yellow Corporation, Case No. 23-11069 (CTG)
Summary of Plan Objections[1]

| Docket No. | Party | Summary of Objection | Debtors' Response |
|---|---|---|---|
| 7830 | **Gregg Sigmund** | • Sigmund objects to the Plan to the extent that it would grant broad releases or immunities to certain executives of the Debtors. | • **Unresolved.** While current and former directors, managers, officers of the Debtors and other Related Parties will receive the benefit of the Third-Party Release, they are receiving the benefit of the Third-Party Release in exchange for the important role that they played in facilitating the formulation and negotiation of the Plan. Furthermore, as outlined in Section II.A.2 of the Confirmation Brief, the Third-Party Release is fully consensual and is not binding on any non-consenting parties.<br><br>• The Court should overrule Sigmund's objection for the reasons set forth herein and in Argument, Section I of the Confirmation Brief. |
| 7886 | **Terreno Clawiter LLC and Terreno Dell LLC (the "Terreno Landlords")** | • The Terreno Landlords object to the Plan to the extent that Article V.A, Article V.D, and Article XII purport to (i) allow certain bankruptcy powers to be exercisable by the Liquidating Trust post-confirmation and (ii) indefinitely extend this Court's jurisdiction over Section 365 matters post-confirmation. | • **Resolved.** The Debtors have agreed to language in the Confirmation Order that resolves this objection. *See* Confirmation Order, ¶ 110. |

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them as set forth in the Confirmation Brief, the Plan, or the Disclosure Statement, as applicable.

| Docket No. | Party | Summary of Objection | Debtors' Response |
|---|---|---|---|
| 7912 | **Local 705 International Brotherhood of Teamsters Pension Fund** | • Local 705 objects to the Plan to the extent that the Plan, the Disclosure Statement, and the Plan Supplement purport to retain previously relinquished claims, causes of action, and other actions on behalf of the estate that may be employed to reduce, disallow, or subordinate Local 705's claims post-Confirmation. | • **Unresolved.** The Court has already considered and rejected Local 705's arguments in holding that the Debtors properly preserved the argument that section 1405(b) applies to subordinate a portion of Local 705's withdrawal liability claims. *See* Preliminary MEPP Opinion, Section V.A. Furthermore, as discussed in more detail in Section IV of this Confirmation Brief, there is no identifiable prejudice to Local 705 (either addressed in the Court's ruling or otherwise). <br><br> • The Court should overrule Local 705's objection for the reasons set forth herein and in Argument, Section I of the Confirmation Brief. |
| 7913 | **NATMI LPF Bloomington, LP et al. (the "Realterm Landlords")** | • The Realterm Landlords object to Article V.B of the Plan to the extent that the Plan purports to classify all claims arising from the rejection of an unexpired lease as general unsecured claims in contravention of sections 503(b)(7) and 503(b)(1) of the Bankruptcy Code. | • **Resolved.** The Debtors have agreed to language in the Confirmation Order that resolves the Realterm Landlords' objection. *See* Confirmation Order, ¶ 112. |
| 7914 | **Jack Peak ("Peak")** | • Peak objects to the Plan to the extent that Article IX.E. or any other Plan provision prevents him from pursuing litigation against debtor Yellow Corporation and requests that the Plan be modified to include a carveout from Article IX.E or any other Plan provision that would prevent him from doing so. | • **Resolved.** The Debtors have agreed to include language in the Confirmation Order that resolves the Peak's objection. *See* Confirmation Order, ¶ 113. |
| 7920 | **Madrona Cutter L.L.C. and Gulsons Cutter, LLC (the "Cutter Landlords")** | • The Cutter Landlords object to the Plan to the extent that Article V.B purports to classify all claims arising from the rejection of all unexpired leases as general unsecured claims in contravention of sections 503(b)(7) and 503(b)(1) of the Bankruptcy Code and request that the Debtors clarify that the Cutter Landlords' claim is an administrative expense. | • **Resolved.** The Debtors have agreed to include language in the Confirmation Order that resolves the Cutter Landlords' objection. *See* Confirmation Order, ¶ 111. |

| Docket No. | Party | Summary of Objection | Debtors' Response |
|---|---|---|---|
| **7925** | **The U.S. Trustee** | • The U.S. Trustee objected to the Plan to the extent that the Plan exculpates parties who are not estate fiduciaries.  Obj. ¶25. | • **Resolved.**  The Debtors have agreed to revise the Plan's definition of Exculpated Parties to resolve the U.S. Trustee's objection.  *See* Plan, Article I.A.67. |
| | | • The U.S. Trustee believes Article IV.A impermissibly deems the Plan to be a settlement.  Obj. ¶29. | • **Resolved.**  The Debtors have agreed to revised language in the Plan that resolves the U.S. Trustee's objection.  *See* Plan, Article IV.A. |
| | | • The U.S. Trustee believes the Plan's automatic claims disallowance and claim amendment restrictions violate section 502(a) of the Bankruptcy Code.  Obj. ¶37. | • **Resolved.**  The Debtors have agreed to revised language in the Plan that resolves the U.S. Trustee's objection.  *See* Plan, Article IV.F. |
| | | • The U.S. Trustee believes that the Plan deems non-voting classes to be accepting classes.  Obj. ¶41. | • **Resolved.**  The Debtors have agreed to remove former Article III.F from the Plan to resolve the U.S Trustee's objection. |

| Docket No. | Party | Summary of Objection | Debtors' Response |
|---|---|---|---|
| 7932 | **MFN Partners, LP and Mobile Street Holdings, LLC** | • MFN/Mobile Street believes that the Plan does not satisfy the "best interests of the creditors" test under section 1129(a)(7) of the Bankruptcy Code because the Disclosure Statement includes a qualitative analysis and "merely conclusory statements" comparing the creditors' outcome under the Plan to that of a hypothetical chapter 7 liquidation. Obj. ¶¶ 27-35.<br><br>• MFN/Mobile Street believes that the proposed governance and composition of the Liquidating Trust Board of Managers (the "<u>Trust Board</u>") violates Bankruptcy Code sections 1129(a)(3) and 1129(a)(5). Obj. ¶ 41. | • **Unresolved.** The Debtors produced to MFN/Mobile a quantitative liquidation analysis, demonstrating that each Debtor provides to applicable creditors a recovery in chapter 7 less than what said creditors would receive under the Plan except for Roadway Express International, Inc., Yellow Logistics, Inc., and YRC Logistics Services Inc., who, as discussed in further detail in this Confirmation Brief, would still do worse in chapter 7 than under the Plan.<br><br>• **Unresolved.** Over the course of several months, the Plan Proponents have engaged with MFN/Mobile Street in discussions regarding the Liquidating Trust Agreement and the various governance mechanisms contained therein. As a result, several revisions, outlined in Section I of the Confirmation Brief, have been agreed to. Accordingly, the Plan Proponents and MFN/Mobile Street have agreed to a governance construct that establishes proper and appropriate governance protocols and recusal mechanisms regarding any potential conflict of interest by a Liquidating Trust Manager. In addition, the Revised Liquidating Trust Agreement filed with the Third Amended Plan Supplement includes additional provisions requested by MFN/Mobile Street.<br><br>• The Court should overrule this objection for the reasons set forth in Argument, Section I of the Confirmation Brief. |
| 7988 | **Old Republic Insurance Company ("<u>ORIC</u>")** | • ORIC filed a reservation of rights while ORIC, the Debtors, and the Committee continued discussions to resolve various issues raised by ORIC regarding the insurance provisions outlined in the Plan. | • **Resolved.** The Debtors have agreed to revised language in the Plan that resolves ORIC's concerns. *See* Plan, Article IV.O, Article V.E. |

| Docket No. | Party | Summary of Objection | Debtors' Response |
|---|---|---|---|
| 8084 | **Environmental Protection Agency** | • The EPA objects to Confirmation, arguing that the Plan's provisions are insufficient to ensure compliance with non-bankruptcy law regarding the Debtors' environmental compliance obligations for operated or previously operated Storage Tanks and that the Liquidating Trustee and that the Liquidating Trustee must comply with environmental state law under section 959(b) of the Bankruptcy Code. | **Unresolved.** The Debtors' business ceased to exist approximately 30 months ago, prior to the filing of these Chapter 11 Cases, and the Debtors have disposed of the vast majority of their assets through a continuing sale process. The Liquidating Trustee, like those addressed by the court in *Borne Chemical* and *Corona Plastics*, will serve only to wind-down and manage the Debtors' limited existing assets, which consist largely of the proceeds of the aforementioned asset sales and retained causes of action, and cannot reasonably be expected to have access to properties disposed of by the Debtors.<br><br>• The Court should overrule EPA's objection for the reasons set forth herein and in Argument, Section I of the Confirmation Brief. |
| **N/A Informal Objection** | **Astra Supply Chain** | • Astra submitted a letter to Debtors' counsel requesting that Astra be released from any and all debts owed to the Debtors because the Debtors have not paid certain outstanding prepetition cargo claims Astra contends are owed by the Debtors. | **Unresolved.** Astra's Objection does not present a basis to deny Confirmation of the Plan and is instead related solely to a claims settlement issue. During the course of these Chapter 11 Cases, the Debtors had previously been engaged with Astra on the potential settlement of the Debtors' claims against Astra, but were ultimately unable to reach a settlement. The Debtors have reengaged Astra on such settlement and there is no reason that continued settlement discussions should prevent the Confirmation of the Plan.<br><br>• The Court should overrule Astra's objection for the reasons set forth herein and in Section IV of the Confirmation Brief. |
| **N/A Informal Objection** | **Chubb Insurance ("Chubb")** | • Chubb Insurance objects to certain of the language in Article V.E. of the Plan regarding "Insurance Policies" and requests the addition of certain language in the Confirmation Order. | **Unresolved.** The Debtors are in continued discussions with Chubb and anticipate this will be resolved ahead of the Confirmation Hearing. To the extent that Chubb's Objection is not resolved, the Debtors' reserve any and all oral arguments in response thereto. |